365 F.2d 792
 Merle E. PARKER, the Foundation for Divine Meditation, Incorporated, Petitioners,
v.
COMMISSIONER OF INTERNAL REVENUE, Respondent.
COMMISSIONER OF INTERNAL REVENUE, Petitioner,
v.
Merle E. PARKER, Respondent.
 No. 18238.
 No. 18239.
 United States Court of Appeals Eighth Circuit.
 September 9, 1966.
 
 COPYRIGHT MATERIAL OMITTED Dr. Merle E. Parker, pro se.
 Thomas Silk, Atty., Dept. of Justice, Washington, D. C., for Commissioner of Internal Revenue; Richard M. Roberts, Acting Asst. Atty. Gen., Lee A. Jackson and Gilbert E. Andrews, Attys., Dept. of Justice, Washington, D. C., on the brief.
 Before VAN OOSTERHOUT, BLACKMUN and GIBSON, Circuit Judges.
 GIBSON, Circuit Judge.
 
 
 1
 This case is before us on a joint petition to review a decision of the Tax Court. T.C.Memo. 1965-77. The corporate petitioner is an organization known as the Foundation for Divine Meditation (F.D.M.) and the individual petitioner is the Reverend Dr. Merle E. Parker, the founder, director, and prime functionary of F.D.M.
 
 
 2
 In 1954 F.D.M. filed an application for exemption from taxation under § 101 (6)[1] of the Internal Revenue Code of 1939. The exemption was denied by the Commissioner in a letter dated November 16, 1955 and this ruling was reaffirmed in a letter dated June 30, 1958. F.D.M. was advised of the necessity to file income tax returns and pay the appropriate amount of tax. Nonetheless, from the year 1954 through 1959 F.D.M. filed no return and paid no tax. The Commissioner determined that a deficiency plus statutory penalties were due. The Tax Court upheld the assessment of the Commissioner.
 
 
 3
 The first issue for determination is whether the Tax Court was justified in ruling that corporate petitioner, F.D.M., was not entitled to a tax exemption as a religious organization under § 501 of the Internal Revenue Code of 1954. (26 U.S.C. 1958 ed. § 501).[2]
 
 
 4
 Petitioners maintain that the ruling of the Tax Court holding that F.D.M. was not entitled to an exemption was erroneous. A reading of petitioners' thorough brief indicates that petitioners' central allegations of error are: (1) The authority vested in the Commissioner to determine if an organization is entitled to an exemption from taxation is a "prior restraint" on the free exercise of their religion and violates their rights under the First Amendment to the Constitution, citing Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900, 84 L.Ed. 1213 (1940). (2) Applying the case of Trinidad v. Sagrada Orden De Predicadores, 263 U.S. 578, 44 S.Ct. 204, 68 L.Ed. 458 (1924) petitioners feel that the only test to determine whether an organization is entitled to an exemption under § 501 as a religious organization is the ultimate destination of its income. This test, petitioners argue, was not applied by the Tax Court.
 
 
 5
 Dealing first with petitioners' Constitutional objections, we do not believe the free exercise of their religion as guaranteed by the First Amendment[3] has been infringed upon by the method of taxation authorized by the 1954 Code. We believe it is constitutionally permissible to tax the income of religious organizations. Watchtower Bible & Tract Soc., Inc. v. Los Angeles County, 30 Cal. 2d 426, 182 P.2d 178 (1947), cert. denied 332 U.S. 811, 68 S.Ct. 112, 92 L.Ed. 389; Mordecai F. Ham Evangelistic Association v. Matthews, 300 Ky. 402, 189 S.W.2d 524, 168 A.L.R. 1216 (1954); Annot. 168 A.L.R. 1222 and cases cited therein; 51 Am.Jur., Taxation, § 610. In fact there are those who contend that the failure to tax such organization violates the "no establishment clause" of the First Amendment. Since the government may constitutionally tax the income of religious organizations, it follows that the government may decide not to exercise this power and grant reasonable exemptions to qualifying organizations,[4] while continuing to tax those who fail to meet these qualifications. The receiving of an exemption is thus a matter of legislative grace and not a constitutional right. As long as exemptions are denied by the Commissioner on a non-discriminatory basis using specific and reasonable guidelines and without inquiry into the merits of the particular religious doctrines, the withholding of religious exemptions is permissible under the Constitution. The guidelines set out in § 501 are certainly reasonable. Petitioners have demonstrated no illegal discrimination in the refusal to grant the exemption, nor have they shown that the refusal was in any way based upon a judgment of the religious tenets espoused by the petitioners. The only judgment made by the Commissioner was that F.D.M. had a substantial non-religious purpose, which judgment, as we shall see later, was entirely justified.
 
 
 6
 Petitioners rely primarily upon Cantwell v. State of Connecticut, 310 U.S. 296, 60 S.Ct. 900 (1940), which reliance, we feel is misplaced. In Cantwell the Court declared that a state could not require a license in order to solicit support for religious doctrines. No such license is being demanded herein. Petitioners are free to espouse their religious doctrine; to publish and to speak. They are free to solicit support for their cause in any way they deem necessary. However, if they desire the special privilege of tax immunity they are expected to follow the reasonable standards enacted by Congress and devote themselves exclusively to the pursuit of religious purposes. If they fail to qualify for this exemption they are still free to practice their religion, solicit funds, and engage in any commercial activities they deem expedient. They simply must pay the tax on their income the same as other individuals and corporations. The religion has not been deprived of its existence by the failure to secure a governmental license.
 
 
 7
 As their second allegation petitioners erroneously conclude that the only test for exemption under § 501 is the ultimate goal or use of the income. The statute clearly recognizes three requirements for exemption, not just one: (1) The organization must be "organized and operated exclusively for religious * * * purposes." (2) "[N]o part of the net earnings [may] inure to the benefit of any private shareholder or individual." (3) "[N]o substantial part of the activities * * * [may be in] attempting to influence legislation * * *". The taxing authorities have clearly recognized and demanded as prerequisites for exemption a demonstration of all three of these elements. Saint Germain Foundation v. Commissioner, 26 T.C. 648 (1956).
 
 
 8
 Trinidad v. Sagrada Orden De Predicadores, 263 U.S. 578, 44 S.Ct. 204 (1924), stated only that receiving income from "limited trading" which was purely incidental to the pursuit of its religious purposes would not deprive a religious organization of its tax exemption as long as the proceeds were used for a religious purpose. So, as recognized in Consumers-Farmer Milk Cooperative v. Commissioner, 186 F.2d 68 (2 Cir. 1950), cert. denied 341 U.S. 931, 71 S.Ct. 803, 95 L.Ed. 1360, not only must the ultimate purpose be religious, any profit must be incidental to this ultimate purpose, and devoted exclusively to that purpose. The Trinidad case thus did not destroy the three statutory requirements for exemption. The primary and basic requirement for exemption is still that the organization must be organized and operated "exclusively" for religious purposes. Only after this primary requirement has been met need we concern ourselves with the destination of any income or the organization's political activities. Appeal of Unity School of Christianity, 4 B.T.A. 61 (1926).
 
 
 9
 Of course, it is well established that the law does not demand a strict application of the word "exclusive" as used in the statute. "Exclusive" dedication to religious purposes is not required where non-qualifying activity is not substantial in nature. Better Business Bureau of Wash. v. Commissioner, 326 U.S. 279, 66 S.Ct. 112, 90 L.Ed. 67. As we stated in Stevens Bros. Foundation, Inc., v. Commissioner, 324 F.2d 633, 638 (8 Cir. 1963):
 
 
 10
 "[I]n order for Foundation to occupy exempt status, it must be devoted to charitable purposes exclusively, and if there is present in its operations a single non-charitable purpose substantial in nature, though it may have other truly and important charitable purposes, it is not entitled to be exempt."
 
 
 11
 A review of the evidence in this case clearly supports the finding of the Tax Court that F.D.M. had a nonexempt purpose that was substantial in nature, and, therefore, under the law, was not entitled to tax exemption.
 
 
 12
 In 1948 Parker became interested in occult philosophy and religion. In 1949 he, along with other individuals whom Dr. Parker preferred to keep anonymous, founded F.D.M. as an unincorporated association with the stated purpose of advancing their ideas on religion and philosophy. Parker was installed as National Director for life. Between the years 1948 and 1953 Dr. Parker received training from Riverside College in California and from the College of Universal Truth in Chicago, Illinois. In 1953 he was awarded a doctorate in metaphysical psychology and divinity from the College of Universal Truth. In 1954, at the cost of $75,000-$80,000, a building was erected in Valley Center, California, which housed the offices of F.D.M. as well as a small meeting hall designed for religious services. In 1955 F.D.M. incorporated as a nonprofit corporation under the laws of California. From Easter 1955 until June 1958 weekly religious services were held in F.D.M.'s building. Attendance ranged from about 40 to 50 adults and children. In addition F.D.M. sponsored swimming and skating parties for members in facilities constructed on the property of F.D.M. There can be no doubt that the services and the sponsored recreational activities were religious in nature and had F.D.M. so restricted its activities, its exempt status would probably not be questioned.
 
 
 13
 Prior to the founding of F.D.M. and throughout the period in question, however, Dr. Parker authored innumerable articles, tracts, monographs, and courses in self-attainment. The results of Dr. Parker's endeavors were not merely made available to the active followers of Dr. Parker and F.D.M. Purchases of these materials were actively solicited by Dr. Parker through the offices of F.D.M. Commercial mailing lists were rented or purchased by F.D.M. with each list containing thousands of names. As a general rule, F.D.M. mailed a general description of the writing offered with a broad pronouncement of its worth and an order form stating that though the publication was not for sale, it could be acquired only by making a certain minimum contribution which varied with the work being offered. The amount of the donation required was undoubtedly calculated to give F.D.M. profit on the sale. On occasion the writings of Dr. Parker were advertised over powerful Mexican radio stations, and via a newspaper published by F.D.M. known as the National Christian Crusader.
 
 
 14
 Dr. Parker received a small salary of $1,200 a year plus a residence as compensation for his services as National Director of F.D.M. It appears that none of the profits received from the sale of these writings inured to Dr. Parker's personal benefit, except possibly some unexplained withdrawals from F.D.M. made by Parker. However, as we observed earlier, the destination of the profit is not the sole factor in determining exempt status. We must look primarily to the organization's purposes. From the facts before us it appears that a very substantial purpose of F.D.M. was the publication and commercial exploitation of the writings of Dr. Parker.
 
 
 15
 Dr. Parker's writings which were published and sold by F.D.M. seem to divide themselves into three general categories. The first of these are courses in self-attainment. A partial list of these courses include the following titles: "Power of the Ages", "Blueprint of Life", "The Sacred Laws Behind Miracles", "Dynamic Speed Hypnosis", "Psychometaphysics", "Sacred Magic of the Ancients", "Cosmic Dynamics", "Miracle Methods of the Masters", "Wisdom of the Ancients". These courses generally pertained to metaphysics, philosophy, faith healing, physical and psychological development and dietary practices.
 
 
 16
 A second category of F.D.M.'s publications were projects promising the subscribing customer financial reward. Though we express no opinion as to what constitutes a religious practice, these subjects appear to us to have little, if any, visible relationship to F.D.M.'s religious activities. One project was the Santa Ysabel Ming Tree Society. Individuals were induced to join the society. Upon the payment of the required "dues" they would be sent ming tree seeds with instructions on their use. Prospective customers of the ming tree seeds were promised the ability to grow $1,000 worth of these trees on a single window sill. A course in "Suggestive Passivity Induction" was offered and sold under the promise that the practitioner of this art could earn up to $10 an hour. F.D.M. under the tutelage of Dr. Parker initiated a "Ten Thousand Dollar Plan", the subject matter of which is not disclosed. The plan was offered to those who donated $10 or more and promised to donate 10 per cent of all the profit they made by the use of the plan. "The Ten Thousand Dollar Plan" was later replaced by "The $25,000 Pyramid Plan" which instructed the purchaser on how to raise earthworms for profit. A ten-lesson plan entitled "Secrets of Wealth, Power, and Success" was also promoted. It cost the recipient $23.30 and promised earnings of $1,000 within six months.
 
 
 17
 A third activity of F.D.M. concerned the conducting of various crusades. The Gospel Treasure Hunt was a fund raising campaign and was conducted in the form of a contest. Each contestant was required to "donate" an entry fee of two dollars and thus become eligible for "big cash awards". All entries were required to be on official entry blanks which were sold by F.D.M. for 75 cents a dozen. F.D.M. also conducted a "Christian Healing Crusade" which requested donations for prayers. On the prayer request form was an announcement of the availability, for a "donation" of $2.50 or more, of the tract, "Instant Healing Now". "The Tobacco Crusade" also received a good measure of F.D.M.'s attention. Materials for this campaign were written by Parker and were offered to subscribers with accompanying price quotations by lot groups. The materials were entitled, "The Cigarette and You", "The Cigarette as the Physician Sees It", and "Death Wrapped in Cellophane".
 
 
 18
 F.D.M. also promoted and sold miscellaneous other writings of Parker. One was the results of "A Secret Research Project" concerning "a startling experiment with the white rat". Another was a tract entitled "Was Roosevelt Killed by the Ancient Death Prayer?" F.D.M. also published and circulated for profit a newspaper entitled "National Christian Crusader". A large part of each issue was devoted to advertising the above-mentioned monographs, courses, and contests sponsored by F.D.M.
 
 
 19
 Dr. Parker, himself, indicated the nature of his position as the head of F.D.M. Two separate "help wanted" advertisements inserted in a general circulation newspaper indicated that, "My business is in the field of Direct Mail Advertising and Promotion." In a letter to the Better Business Bureau, Parker wrote, "I am a mail order publisher and in business to stay." In 1952 Dr. Parker's income tax return indicated that his principal business activities were "selling books and lecture courses by mail."
 
 
 20
 An observation of gross income figures of F.D.M. indicates that from 1954 through 1959 the gross income of the organization ranged from an annual low of approximately $29,000 to an annual high of $207,435. In 1957 a sworn statement of net worth indicated that F.D.M. had a surplus of nearly $290,000. This high annual income and large surplus tends to indicate the commercial rather than the religious nature of the foundation. Scripture Press Foundation v. United States, 285 F.2d 800 (Ct.Cl.1961).
 
 
 21
 Whether or not an organization has a substantial nonexempt purpose is, of course, a question of fact to be determined by the Tax Court. As a question of fact, the determination will not be disturbed by this Court unless the finding was clearly erroneous. 26 U.S.C. § 7482; Omaha Nat. Bank v. Commissioner, 183 F.2d 899, 25 A.L.R.2d 628 (8 Cir. 1950); Hammerstein v. Kelley, 349 F.2d 928 (8 Cir. 1965); Stevens Bros. Foundation, Inc. v. Commissioner, supra. The above outline of the evidence clearly supports the finding that F.D.M. was pursuing a substantial non-exempt purpose. Consequently the ruling of the Tax Court on this issue is affirmed. F.D.M. is not entitled to a tax exemption under § 501.
 
 
 22
 We are not saying herein that religious organizations may not maintain their tax exempt status if they conduct healing crusades, take stands for or against various moral issues, publish newsletters, or offer their literature for sale. The non-religious purpose of this particular organization was evidenced by the extent and scope of the profit-making circulation, the methods of promotion, the general non-religious subject matter of some of the publications, the large annual profit, the substantial accumulated earnings, and the statements made by Dr. Parker. When all of this is viewed in relationship to the organization's exempt activities, the substantial nature of the non-religious purpose is established. We mention the healing and tobacco crusades, not because they are normally to be considered non-exempt activities, but primarily because, as used herein, they appear to be merely vehicles for the promotion of F.D.M.'s commercial publishing activities.
 
 
 23
 Dr. Parker expresses a personal fear that "dark powers" are attempting to destroy his foundation and his religious practices. The courts of this nation have always been sympathetic to minority causes and have been quick to afford them every protection available under the Constitution. However, it appears to us that the Commissioner has merely made an objective evaluation of F.D.M.'s operation and from the facts before us we do not believe the Commissioner employed any tactics in assessing this tax that offend constitutional guarantees.
 
 
 24
 We now turn our attention to the assessment of the individual petitioner, Dr. Parker. His assessment included four items. (1) Unaccounted-for and unexplained withdrawals from the account of F.D.M. (2) Checks made payable to Dr. Parker drawn on the account of F.D.M. (3) Penalties for failure to file returns for the years 1956 and 1957. (4) Legal expenses paid by F.D.M. in defending a criminal action brought against Dr. Parker and in prosecuting a civil slander action.
 
 
 25
 Dr. Parker was the founder of F.D.M. He had control of its day-to-day activities. He had complete control of its finances with authority to draw checks on its account. The financial records of F.D.M., to say the least, were incomplete; and it appears that Dr. Parker's personal funds were to a degree commingled with the funds of F.D.M. The other directors of F.D.M. met only at infrequent intervals and, in fact, exercised little, if any, control over the activities of the foundation. In examining the records of F.D.M. for the years 1955-1959 internal revenue agents were unable to classify numerous withdrawals in the following amounts for the years in question $2,210.10, negligible, $1,300.27, $5,197.21, and $8,948.34 respectively. These unidentified withdrawals were credited to the income of Dr. Parker. The Tax Court sustained this action, and we affirm.
 
 
 26
 Due to the extremely close relationship between Dr. Parker and the day-to-day financial activities of F.D.M. and due to Dr. Parker's complete and unfettered control over F.D.M., he has the burden of explaining unidentified withdrawals from the F.D.M. account. Reinecke v. Spalding, 280 U.S. 227, 50 S.Ct. 96, 74 L.Ed. 385 (1930); Arc Realty Company v. Commissioner, 295 F.2d 98 (8 Cir. 1961). If he is unable to do so the Commissioner may validly assume that the withdrawals were income to Dr. Parker. No evidence of any kind was produced explaining the withdrawals or indicating that Dr. Parker did not receive the benefit therefrom. Therefore, the assessment of these amounts was proper. Marcella v. Commissioner, 222 F.2d 878 (8 Cir. 1955).
 
 
 27
 On a very similar point, two checks, one in the amount of $1,000 and the other for $500, were drawn on the F.D.M. account, signed by Parker and made payable to Parker. He contends that these two checks represent the repayment of a loan made to F.D.M. Dr. Parker has presented no accounting entry tending to prove the existence of a debt. He has introduced no contemporary memorandum of a loan or the indebtedness. He has presented no testimony, other than his own, that such a loan was made. Under the circumstances we believe that the Tax Court was not required to accept the unsupported word of the petitioner. Marcella v. Commissioner, supra; Elzig v. Gudwangen, 91 F.2d 434 (8 Cir. 1937). Therefore, these payments to Parker may be considered as income to him. Any overtaxation of the petitioner is due to his failure to keep adequate records and accounts. For this he has none to blame but himself. If the law were otherwise, taxes could be evaded simply by failing to keep adequate records.
 
 
 28
 The Commissioner assessed a 25 per cent penalty on the tax due for the years 1956 and 1957 under authority of § 6651(a) of the Internal Revenue Code of 1954, which provides for the assessment of such penalty for the failure to file a timely return.
 
 
 29
 It appears that for the year 1956 Parker mailed a piece of plain paper to the District Director reporting no tax payable. That paper along with a regular Form 1040 were returned with instructions that the 1040 be completed and returned. A Form 1040 was never filed. Parker asserts that he never received the instructions to the effect that the return on the plain paper was insufficient, and further asserts that the submission of a plain piece of paper showing no tax due should exempt him from the penalty provision.
 
 
 30
 Taxpayers are required to file timely returns on forms established by the Commissioner. If the taxpayer fails to submit his return on the form prescribed he may be subjected to the penalty provided. Of course, at his option, the Commissioner may accept a substituted provisional form under § 1.6011.1(b) of the Treasury Regulations on Income Tax. This, however, does not exempt the taxpayer from later filing a return on a proper form. The Commissioner is certainly not required to accept any facsimile the taxpayer sees fit to submit. If the Commissioner were obligated to do so, the business of tax collecting would result in insurmountable confusion. Commissioner v. Lane-Wells Co., 321 U.S. 219, 64 S.Ct. 511, 88 L.Ed. 684 (1944). It is our opinion, that even if a taxpayer submits a return, but it is not on the printed form provided, under the authority of Regulation § 1.6011.1 and § 6651(a) I.R.C. of 1954 the Commissioner may assess the statutory penalty, "unless it is shown that such a failure is due to reasonable cause and not wilful neglect". This is especially true when the taxpayer fails to submit at a later date a supplemental return on the required form.
 
 
 31
 In this case Dr. Parker presented no reason for filing his 1956 return on a plain piece of paper. Dr. Parker is an intelligent and educated person with considerable experience in the business world. He had properly filed many returns in the past. Furthermore, he gave no adequate reason for not later filing the correct return when notified by the Commissioner, other than he doesn't remember receiving any such instructions. Under the circumstances Dr. Parker has not shown reasonable cause for his failure to file the proper return. The assessment of a penalty for that year was correct.
 
 
 32
 As to the year 1957 Dr. Parker testified that he thought he had filed a return. However, a search of the Internal Revenue office turned up no return for Dr. Parker for this year. Dr. Parker presented no copy of a return or presented any evidence indicating that a 1957 return was filed. Clearly, a very small percentage of returns actually mailed are lost or misplaced by the Commissioner. We feel that this percentage is so small that we could justifiably infer from the fact that no return was found by the Commissioner that none was actually mailed. Absent any positive evidence to the contrary, this inference supports the finding of the Tax Court. The penalty assessment for 1957 was also proper.
 
 
 33
 In 1956 a criminal action was instituted against Dr. Parker for contributing to the delinquency of a minor. After a jury trial, Parker was found not guilty. F.D.M. bore the expense of defending this litigation by drawing checks in the amount of $1,200 in 1956, $2,350 in 1957 and $600 in 1958. Subsequent to the criminal action, Dr. Parker instituted a civil slander action against a medical doctor and the mother of the minor to whose delinquency Parker was alleged to have contributed. F.D.M. also bore the expense of this action. It drew checks in the amount of $500 in 1956, $48 in 1957, $1,000 in 1958. The Commissioner determined that these amounts were paid on the behalf of Parker and thus taxable to him in the year paid. The Tax Court affirmed this finding. After a thorough consideration we are of the opinion that the Tax Court should be reversed on this matter.
 
 
 34
 It is our understanding that the incident giving rise to the criminal charge allegedly took place on the property of F.D.M. and was allegedly committed in the performance of Dr. Parker's duties as director of F.D.M. Had Dr. Parker paid these costs himself they probably would have been deductible by him as "ordinary and necessary" expenses in conducting a trade or business. Commissioner v. Tellier, 383 U.S. 687, 86 S.Ct. 1118, 16 L.Ed.2d 185 (1966) affirming 342 F.2d 690 (2 Cir. 1965). Since these expenses were paid by F.D.M. on behalf of Parker and itself, we do not understand the Commissioner's zeal in attempting to tax these expenditures as income to Parker.
 
 
 35
 Of prime importance, however, due to the almost complete identity of F.D.M. with Dr. Parker, we believe that the defense of the suit against Dr. Parker was in the direct interest of F.D.M. Had Dr. Parker been found guilty of the charge, this would have assured the collapse of the Foundation. Not only would the Foundation have been deprived of Dr. Parker's services, but the moral condemnation involved in the charge would have attached to the organization with which he was so intimately associated.
 
 
 36
 We cannot separate the acts of Dr. Parker while acting on behalf of F.D.M. from the acts of F.D.M. Likewise, we cannot accept that the expense of defending criminal charges arising out of his activities as the leader of F.D.M. are uniquely personal to him even though F.D.M. is not criminally liable for his acts. Unlike large commercial operations whose business reputation is not necessarily damaged when one of the officers is faced with community censorship, (See Pantages Theater Co. v. Welch, 71 F.2d 68 (9 Cir. 1934)), a small direct advertising and soliciting organization with accompanying religious activities, completely dominated by the personality of one man depends for its continued existence on the community acceptability of this man's moral standing. If the man suffers serious moral condemnation, the organization suffers the condemnation along with him. To an organization whose existence depends upon the attraction of loyal followers and direct mail customers, this condemnation is a sentence of death. A small religiously oriented corporation cannot expect to live a long life when the trust and respect of the followers for the founder and leader of the movement have been shattered by a criminal conviction on a morals charge.
 
 
 37
 In the same light the bringing of the slander action sought to further clear the names of Dr. Parker and F.D.M. from the cloud that remained even after the verdict of not guilty. The organization had no cause of action, and only Parker could bring the charge; but even so, a successful conclusion of the slander action would inure to the direct and substantial benefit of F.D.M.
 
 
 38
 It is, therefore, our opinion that these legal expenses not only resulted in a direct benefit to the organization, they were expenditures calculated to secure the very survival of the organization itself. Consequently, all of the expenditures incurred in defending the criminal action against Dr. Parker and in prosecuting the slander action in the name of Dr. Parker can be said to have been made for the benefit of the Foundation in an attempt to preserve its community reputation, its income-producing ability, and consequently its survival. As a consequence these expenditures are not income to Dr. Parker even though he, too, received a benefit therefrom, Robert S. Howard v. Commissioner, 32 T.C. 1284 (1959). Since the defense of the criminal action and the cost of prosecuting the slander action are ordinary and necessary business expenses of F.D.M., they are deductible expenses of F.D.M. It would follow from this that such deductible expenses could not properly be considered as income to Dr. Parker.
 
 
 39
 Therefore, in all respects, save the determination of the legal expenses, the ruling of the Tax Court is affirmed. As to the tax liability of Dr. Parker and F.D.M. the decision of the Tax Court is reversed only as to the issue of the legal fees and expenses paid by F.D.M. and taxed against Dr. Parker. The Commissioner filed a cross-petition "for protective purposes only in the event this Court decides that those items of income were not taxable to F.D.M." Since, we have decided that income to F.D.M. was taxable we need not consider the issues raised in the cross-petition. The case is remanded for recalculation of the tax and penalty due in accordance with the views expressed in this opinion.
 
 
 40
 Affirmed in part, reversed in part, remanded.
 
 
 
 Notes:
 
 
 [1]
 § 101, 1939 Code provides:
 "§ 101 Exemptions from tax on corporations
 "Except as provided in paragraph (12) (B) and in supplement U, the following organizations shall be exempt from taxation under this chapter —
 "(6) Corporations, and any community chest, fund, or foundation, organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, and no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation."
 
 
 [2]
 § 501 of 1954 Code in its pertinent part provides:
 "(a) Exemption from taxation. — An organization described in subsection (c) or (d) or section 401(a) shall be exempt from taxation under this subtitle unless such exemption is denied under section 502, 503, or 504.
 "(c) List of exempt organizations — The following organizations are referred to in subsection (a):
 "(3) Corporations, and any community chest, fund or foundation, organized and operated exclusively for religious, charitable, scientific, testing for public safety, literary, or educational purposes, or for the prevention of cruelty to children or animals, no part of the net earnings of which inures to the benefit of any private shareholder or individual, no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements) any political campaign on behalf of any candidate for public office."
 
 
 [3]
 The First Amendment provides in part:
 "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; * * *."
 
 
 [4]
 We are expressing no opinion as to whether the grant of an exemption violates the "no establishment clause" of the First Amendment