BUBBLING WELL CHURCH OF UNIVERSAL LOVE, INC.,
PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE,
RESPONDENT

Docket No. 5717–79X.     Filed June 9, 1980.

*Peter R. Stromer*, for the petitioner.
*Richard G. Goldman*, for the respondent.

FEATHERSTON, *Judge:* This is an action for declaratory judgment pursuant to section 7428(a).[1] Petitioner filed an application for recognition of exemption from Federal income tax on June 9, 1977, seeking exemption under section 501(c)(3) and claiming to be a church within the meaning of sections 509(a)(1) and 170(b)(1)(A)(i). Upon completion of the administrative consideration of petitioner's status, the Internal Revenue Service on April 11, 1979, issued an adverse ruling in part as follows:

You are neither organized nor operated for one or more exempt purposes within the meaning of section 501(c)(3) of the Code. You are organized and

---

[1]All section references are to the Internal Revenue Code of 1954 in the form applicable in this case.

operated for private benefit, and your net earnings inure to the benefit of private individuals. We have also determined that if you were an organization described in section 501(c)(3), you would be a private foundation because you are not a church within the meaning of section 170(b)(1)(A)(i), the only basis on which you claim non-private foundation status.

Following the issuance of the adverse determination letter, petitioner timely filed the present action seeking a declaratory judgment that it is entitled to exemption as a church. The administrative record has been stipulated, and the controlling facts are here briefly summarized.

Petitioner filed its articles of incorporation with the Secretary of State of California on January 13, 1977. They recite that petitioner is organized for nonprofit purposes and that it is formed primarily to operate a church. The articles recite that the authorized number and qualification of members of the corporation, the different classes of membership, if any, and the voting and other rights and privileges of the members shall be set forth in the bylaws.

Appendix A to the bylaws states that there shall be two classes of members of the corporation. The first class shall be the voting members, and they shall be the members of the board of directors of the corporation. The second class, known as associate members, shall include -any person who contributes funds or property to petitioner. Each voting member shall be entitled to one vote at petitioner's meetings, and associate members shall not be entitled to vote. No notice of any meeting of the membership need be given to any associate member.

At all times here pertinent, petitioner's only voting members were president John Calvin Harberts (Harberts) and secretary-treasurer Catherine C. Harberts, husband and wife, and vice president Dan C. Harberts, their son. They were also the only members of the board of directors. Petitioner's address was Harberts' residence, and he was the registered owner of the property on which the residence is located. The Harberts family thus completely controlled petitioner's operations and were in a position, as the only voting members, to perpetuate that control.

Petitioner states that it was "formed to disseminate as its tenets a belief in a Supreme Being who does not differentiate in bestowing his benevolence on all species of life, whether of this earth or in the life hereafter." Petitioner adds that: "The specific purpose for which this organization was formed is to

disseminate this transcendental concept encompassed with its tenets." The administrative record contains no elaboration of these tenets. Petitioner had no literature explaining its tenets and conducts no training schools.

Harberts is the son of a Presbyterian minister who has been active in church and choral functions throughout his lifetime, but he has no formal theological training. He holds a certificate of ordination from the Universal Life Church, Inc.[2] Petitioner, however, was not affiliated with that organization or any other organization, denomination, or sect. Mrs. Harberts has an extensive choral and music background. Dan C. Harberts was graduated from the University of California with a degree in business administration.

On February 17, 1978, the Internal Revenue Service requested petitioner, among other things, to furnish a list showing the names and addresses of its active members and a statement showing the amounts and names of donors for each contribution during 1977 and 1978 to date. This list would have disclosed the names of petitioner's associate members as defined in the bylaws. Petitioner objected to furnishing this information and did not do so on the ground that requiring it to make that disclosure would violate the First Amendment to the Constitution. The Internal Revenue Service twice requested similar information suggesting use of code numbers rather than the names of the donors, but petitioner's response was virtually meaningless except that petitioner advised that: "Directors, officers, trustees, etc. contributions are included" among the contributors. Thus, the only three contributors who have been identified are the members of the Harberts family.

On February 17, 1978, the Internal Revenue Service also requested petitioner to furnish an itemized statement of income and expenses for the year ended December 31, 1977. The response showed the following:

*Income:*
Donations and free-will offerings ..................... $61,169.80

---

[2]According to a stipulation filed in *Universal Life Church, Inc. v. United States*, 372 F.Supp. 770, 775 (E.D. Cal. 1974), holding that organization exempt, the Universal Life Church, Inc., ordains "anyone for life gratis (upon request)," and it distributes ministerial credentials "by mail, at college rallies, and at other public meetings."

*Expenses:*

| | |
|---|---|
| Medical | $768.46 |
| Equipment | 461.00 |
| Public relations | 245.49 |
| Travel | 2,529.26 |
| Insurance | 627.24 |
| Maintenance and supplies | 9,237.72 |
| Office supplies and maintenance | 1,220.99 |
| Supply inventory | 6,629.54 |
| Utilities | 2,883.41 |
| Parsonage allowance | 13,648.20 |
| Living allowance, minister | 19,468.02 |
| Church artifacts | 2,050.00 |
| Legal fees | 1,346.60 |
| Miscellaneous | 427.08 |
| Total expenses | 61,543.01 |

To qualify for exemption under section 501(c)(3),[3] petitioner has the burden of showing (1) that it was organized and operated exclusively for religious or charitable purposes, (2) that no part of its earnings inured to the benefit of a private individual or shareholder, and (3) that no substantial part of its activities consisted of the dissemination of propaganda or otherwise attempting to influence legislation or engaging in political activity. Sec. 1.501(c)(3)–1, Income Tax Regs. Even for an organization claiming the benefits of section 501(c)(3) as a religious organization, "exemption is a privilege, a matter of grace rather than right." *Christian Echoes National Ministry, Inc. v. United States,* 470 F.2d 849, 857 (10th Cir. 1972), cert. denied 414 U.S. 864 (1973).

After careful consideration of all the evidence of record, we are not satisfied that petitioner has made the requisite showing.

Preliminarily we note that petitioner, at all pertinent times, was completely dominated by the Harberts family—a father, mother, and son. Because they were the only voting members

---

[3]SEC. 501. EXEMPTION FROM TAX ON CORPORATIONS, CERTAIN TRUSTS, ETC.
(c) LIST OF EXEMPT ORGANIZATIONS.—The following organizations are referred to in subsection (a):

  *   *   *   *   *   *   *

(3) Corporations, * * * organized and operated exclusively for religious * * * purposes, * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual * * *

and they composed the board of directors, the Harberts were in a position to perpetuate this control of petitioner's operations and activities indefinitely. Petitioner had no affiliation with any denomination or ecclesiastical body and, therefore, the Harberts family was not subject to any outside interference or influence in the control of petitioner's affairs. This means that the Harberts, without challenge, could dictate petitioner's program and operation, prepare its budget, and spend its funds, and could continue to do so indefinitely.

The record contains no explanation of why the Harberts chose to arrange petitioner's organization and operation in this manner—particularly when some of the statements submitted by petitioner suggest that it sought to proselytize others to its faith. While this domination of petitioner by the three Harberts, alone may not necessarily disqualify it for exemption, it provides an obvious opportunity for abuse of the claimed tax-exempt status. It calls for open and candid disclosure of all facts bearing upon petitioner's organization, operations, and finances so that the Court, should it uphold the claimed exemption, can be assured that it is not sanctioning an abuse of the revenue laws. If such disclosure is not made, the logical inference is that the facts, if disclosed, would show that petitioner fails to meet the requirements of section 501(c)(3). See *Founding Church of Scientology v. United States*, 188 Ct. Cl. 490, 498, 412 F.2d 1197, 1201 (1969), cert. denied 397 U.S. 1009 (1970); *Parker v. Commissioner*, 365 F.2d 792, 799 (8th Cir. 1966), affg. a Memorandum Opinion of this Court, cert. denied 385 U.S. 1026 (1967).

We do not think the administrative record as stipulated by the parties makes the necessary showing. Quite to the contrary, petitioner declined to furnish some of the information requested of it. Moreover, the answers to other inquiries were vague and uninformative.

We are not convinced from the information in the administrative record that part of the net earnings did not inure to the benefit of the Harberts family or, stated another way, that petitioner was not operated for the Harberts' private benefit. Of the total income of $61,169.80 in 1977, at least a substantial portion, if not practically all, was expended for the benefit of members of the Harberts family. Without question, they received, or benefited from, $19,468.02 designated as "Living

allowance, minister"; $13,648.20 as "Parsonage allowance"; $768.46 as medical expenses; $627.24 as a payment for medical insurance; and $2,529.26 as travel expenses (including a trip by Harberts to Europe); a total of $37,041.18. The address of petitioner is the Harberts' residence, and the record does not show that the $2,883.41 designated as the cost of utilities did not cover utilities for the Harberts' home.

The Internal Revenue Service requested petitioner to supply a more detailed breakdown of another $17,088.25 (composed of $9,237.72 designated as "Maintenance and supplies"; $1,220.99 as "Office supplies and maintenance"; and $6,629.54 as "Supply inventory"). The only information that had been furnished prior to the request for the breakdown was the general statement that these amounts were expended for hymnals, initial expenditures for church and office equipment, postage, chapel decoration, Christmas lighting, and Easter decorations. Petitioner's response to the request for details was that: "No further breakdown * * * is possible without extensive research which appears totally unwarranted." The inference from this failure to furnish requested facts with respect to these expenditure items is that such facts would have been detrimental to petitioner's cause. *Founding Church of Scientology v. United States*, 188 Ct. Cl. at 498, 412 F.2d at 1201; *Parker v. Commissioner, supra* at 799; see also *Stoumen v. Commissioner*, 208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court, and cases cited.

Significantly, nothing is shown in the statement of income and expenses as budgeted or expended for the care of the needy, the sick, or the imprisoned, traditionally the beneficiaries of the ministration of churches. Petitioner stated that it follows "standard Protestant forms of ritual and [has] also incorporated particular Congregationalist practices, as well as Quaker practices of individual and group participation in religious worship," but the administrative record contains no direct information on whether worship services are actually conducted and, if so, who attends or participates in the meetings. Nothing is shown as budgeted or expended for any kind of mission or evangelistic program with the possible exception of the travel expenditures. Travel expenses of $2,529.26 were stated to have been made in part for "local and overseas travel by the pastor on church business proselytizing new church members. Said travel was

approved by the Board of Directors." The minutes of the special meeting of the board of directors dated December 20, 1977, refers to a report from the president "re overseas trip to Europe, visiting other churches, proselytizing of new church members recruited in Rothenburg, Germany." No objective facts are detailed to explain the relationship of a visit to Germany to this organization and, of course, the decision to expend these funds was made by the Harberts family. From the vague information which has been furnished on petitioner's operations and finances, it thus appears highly probable that virtually all of the income reflected in petitioner's statement of income and expenses benefited only the Harberts.

In answer to Internal Revenue Service requests for explanations of how petitioner determined the amount of the living allowance, parsonage allowance, and other payments to the Harberts family, petitioner replied that: "The Board of Directors of the church independently determines the pastor's parsonage allowance," and that: "The Board determines what it considers to be reasonable compensation for services rendered." In response to a further request for a more detailed explanation, petitioner stated that:

Compensation was based on the board's independent determination after research and consideration of what this church board believed its pastor was entitled to and, of course, what this church could afford based on anticipated revenues. There are no minutes on the subject.

Again, as noted above, the board of directors was composed of the three members of the Harberts family, and no one else had authority to review their decisions.

If members of the Harberts family were actually engaged in performing employment services, compensating them in reasonable amounts for those services would not disqualify petitioners for exemption. *Birmingham Business College, Inc. v. Commissioner*, 276 F.2d 476, 480–481 (5th Cir. 1960), affg. on this issue a Memorandum Opinion of this Court. But excessive payments made purportedly as compensation constitute benefit inurement in contravention of section 501(c)(3). *Mabee Petroleum Corp. v. United States*, 203 F.2d 872, 876 (5th Cir. 1953); *Gemological Institute of America v. Commissioner*, 17 T.C. 1604, 1609 (1952), affd. per curiam 212 F.2d 205 (9th Cir. 1954). The question of whether salary and other compensation payments are reasonable in amount is purely a question of fact to be resolved in the light

of all the evidence. *Mabee Petroleum Corp. v. United States, supra* at 875; *Unitary Mission Church of Long Island v. Commissioner,* 74 T.C. 507 (1980).

Petitioner furnished no information to the Internal Revenue Service that would justify the payment of virtually all of petitioner's income to the Harberts as compensation or reimbursement. In a letter dated March 9, 1978, it is stated that: "Each officer or member of the board of directors devotes 100 percent of his time to church activities. No outside employment." Yet, the administrative record contains virtually no information as to what the officers and members of the board of directors did. The record states that Harberts has made ministerial visitations and performed several burial services and one marriage service; it is stated that no California license is required for such activities. There is no clue as to what Mrs. Harberts and the son, Dan C. Harberts, did on behalf of petitioner to consume 100 percent of their time. We do not think the vague information which has been furnished is sufficient to show that the compensation and reimbursements to the Harberts were reasonable in amount.

As pointed out above, there is no evidence of the expenditure of funds for the benefit of the needy. There is no direct evidence of any regular schedule of worship or evangelistic services conducted by Harberts. Indeed, the dates shown on a schedule which purportedly sets forth a log of contributions received by petitioner do not indicate any regular pattern of worship services or meetings at which contributions were made.

By declining in a letter dated March 9, 1978, to furnish a list of the names and addresses of its active members, petitioner effectively denied the Internal Revenue Service an opportunity to obtain information from anyone, except the three Harberts family members, on petitioner's operations and the purposes for which it expended available funds. In the circumstances of this case, we do not think requiring petitioner to furnish a list of its associate members would violate the First Amendment. As explained in *Bronner v. Commissioner,* 72 T.C. 368, 371 (1979), where the Commissioner requested a list of members of an organization claiming exemption as a church:

"To state that individual liberties may be affected is to establish the condition for, not to arrive at the conclusion of, constitutional decision." It seems clear that, particularly where the Government shows a need for the information,

that the party asserting the constitutional privilege must show that disclosure of the information will be prejudicial to those asserting the privilege, such as exposure to public hostility * * * , or deterrence of free association * * * , or denial of anonymity where there is reason therefor * * * . Where such prejudice is shown, there must be a weighing of the respective interests in order to determine whether the information need be disclosed. * * *

This weighing and balancing principle was explained in *United States v. Holmes,* 614 F.2d 985 (5th Cir. 1980), where the issue was the extent of the Government's right to obtain information by way of discovery in a case involving an organization claiming exemption as a church, as follows:

The Supreme Court has employed a two part balancing test in determining when such conduct is protected by the free exercise clause. First, plaintiff must show a burden on the exercise of his religion by the law under review. Second, the burden will be upheld only if the government interest outweighs the degree of impairment of free exercise rights. * * *

Requiring plaintiff to comply with a properly narrowed summons in order to show its entitlement to tax exempt status results in only an incidental burden upon his free exercise of religion. * * * Plaintiff is free to espouse his religious doctrine and to solicit support for his cause. He simply must allow the government access to information in order to determine whether the church remains within the criteria for a lighter tax burden. The church may, of course, forego the exemption and limit IRS access to church records.

Balanced against the incidental burden on church religious activities is the substantial government interest in maintaining the integrity of its fiscal policies. * * * This interest is sufficiently compelling to justify any incidental infringement of plaintiff's First Amendment rights. * * * [Citations and fn. ref. omitted.]

See also *Parker v. Commissioner, supra* at 795–796; *Christian Echoes National Ministry, Inc. v. United States, supra* at 857.

We hold that petitioner has not shown that no part of its net earnings inure to the benefit of the Harberts family or that petitioner was not operated for the private benefit of the Harberts family, and that respondent did not err in denying the exempt status claimed under section 501(c)(3).[4]

To reflect the foregoing,

*Decision will be entered for the respondent.*

---

[4] Basing our decision on this ground, we express no view on respondent's other arguments that petitioner was neither organized nor operated for exempt purposes within the meaning of sec. 501(c)(3).