CARL A. and JANICE MANSON, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Manson v. Commissioner
Docket No. 6062-78.
United States Tax Court
T.C. Memo 1980-315; 1980 Tax Ct. Memo LEXIS 273; 40 T.C.M. (CCH) 972; T.C.M. (RIA) 80315; August 13, 1980, Filed Jerome F. Farrell, for the petitioners. Charles W. Maurer, *274 Jr., for the respondent. RAUM
MEMORANDUM FINDINGS OF FACT AND OPINION RAUM, Judge: The Commissioner determined a deficiency of $3,784.94 in petitioners' 1974 income tax. After concessions, the only issue for decision is whether petitioners, husband and wife, are entitled to deductions for charitable contributions purportedly made to the "Church of Eternal Hope" of Springfield, Massachusetts, of which Mr. Manson was the "minister". FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and related exhibits are incorporated herein by this reference. Petitioners were residents of Springfield, Mass., at the time their petition was filed. This case concerns principally the activities of Mr. Manson, and he will sometimes hereinafter be referred to as petitioner. Petitioner is a licensed real estate agent in Massachusetts, and his principal source of income is commissions on the sale of real estate. He has never attended any theological seminary, nor has he ever had any formal religious education. He graduated from high school in 1938. After leaving the armed services at the end of World War II, he attended Wentworth Institute *275 under the G.I. Bill of Rights for two years beginning in 1946, where he studied machine design. He apparently thereafter worked for a time in a machine shop as a tool and die maker, and has since then "been in direct sales of some sort * * * from automobiles on up". He began selling real estate in 1960. During the taxable year 1974 he earned $22,375 in real estate commissions and $5,535.15 as a salesman of meat and frozen foods. These amounts constitute the only income reported by him for 1974. The Church of Eternal Hope of Springfield, Mass. (the Church), [1] was organized as a Massachusetts corporation in July, 1970. It was established primarily as a result of efforts by one Donald Foster, a purported "minister". Foster worked full-time in various secular employments, but failed to hold a job for any significant length of time because of a "drinking problem". He held no degrees in theology, and his religious credentials appear to be based on a "Certificate of Ordination" received by mail from the "Life Science Church" of Rolling Meadows, Illinois. The communication of April 21, 1970, from the so-called "Archbishop" of that institution, transmitting Foster's Certificate *276 of Ordination is of such character as to raise serious question whether the "Life Science Church" is a bona fide church. The "Church of Eternal Hope" has no connection with the "Life Science Church". The three original officers of the Church of Eternal Hope were Foster, his wife Nancy, and a person named Kenneth Sharron. There are reports of the annual meetings of the Church in July of 1970, 1971, and 1972. No receipts or expenditures were shown in the first report, but the reports for 1971 and 1972 show aggregate receipts of $3,000 and $4,000, respectively, for those fiscal years, and total expenditures in like amounts, the bulk of which represented payments to or expenditures for Foster's welfare. No annual meetings were held thereafter nor are there any financial *277 reports for any year subsequent to 1972. The Fosters and petitioners were friends and neighbors. They resided in the same house in Springfield, Mass., but they had separate apartments in the building, which had four units. Although petitioner's name appears in some of the documents as a member of the "Standing Committee" at the time the Church was organized in 1970 and is shown as "Assistant Pastor" in the foregoing annual reports for the years 1970-1972, he did not "join" the Church until 1972. Foster's name appeared on those reports as "Bishop"; no other ministers were shown therein. Until his death in December 1973, Foster maintained a checking account in the name of the Church. He deposited his secular earnings into this account and drew checks upon it for his own personal use. He had sole control over that account and in effect treated it as his personal checking account. Sometime after "joining" the Church in 1972 petitioner became "minister". Foster was having personal problems related to his drinking habits, and petitioner more or less took over in April 1973. Until his death in December of that year Foster continued to maintain his "personal" Church bank account *278 referred to above. However, pursuant to an agreement with Foster, petitioner opened his own checking account in the name of the Church, and petitioner alone had the power to make withdrawals from that account. Petitioner deposited a considerable portion of his salesman's earnings into that account and used it for his personal purposes, as more fully hereinafter set forth. Until Foster's death, there were thus two checking accounts in the name of the Church, one under Foster's control and the other under petitioner's. They were maintained entirely separate and apart from one another. Whatever went into petitioner's Church account was whatever he chose to put in. Prior to opening his so-called Church account, petitioner had maintained a personal checking account in his own name. With the creation of his Church account, petitioner abandoned his then existing personal checking account, and thereafter used the Church account for the same purposes as his prior personal checking account. Apart from some possible relatively minor contributions, virtually all of the deposits to petitioner's Church account in 1974 represented earnings which petitioner had received as a salesman that *279 year. Total deposits to that account in 1974 amounted to approximately $13,700.Checks drawn on that account were used to pay for the various personal living expenses of petitioner and his wife, as well as business expenses incurred by him in his activities as a salesman. His total subsistence "was paid out of the church checking account * * * [everything] pertaining to my living expenses". Thus, petitioner drew upon the account to pay the rent on his apartment, utility bills, obligations arising from the use of American Express and other credit cards, charges for his clothes, premiums on his wife's life insurance, and even for a parking ticket. A number of checks were made out to his wife to supply her with cash for groceries, as well as for household and personal needs. Petitioner had three automobiles in 1974, a Cadillac about two years old, a Buick about three years old, and a Falcon -- all registered in the name of the Church. He was not only "making auto payments to a bank out of the church checking account", but all the gasoline for the cars was being paid for out of the Church checking account, notwithstanding that he used a percentage of the mileage on the cars as the *280 basis for a deduction of business expenses on petitioners' joint personal income tax returns. Petitioner used the "big" car in his real estate business, his wife used another car (probably the Buick), and petitioner used the "little one" in connection with "the meat business". In 1975, petitioner made investments in the "option market", purportedly on behalf of the Church. Petitioner invested a total of approximately $8,000 in the market; $2,000 came from the Church checking account, and $6,000 came from a cashier's check petitioner had received in 1974 as commissions on several real estate transactions. Petitioner had two trading accounts with brokerage firms.One account was in the name of the Church, and the other was held in petitioner's name because the brokerage firm refused to allow him to trade in the name of the Church. The investments were unsuccessful, resulting in the loss of approximately $7,000. The remaining $1,000 was deposited to the Church checking account. As indicated above, the Church of Eternal Hope was organized as a Massachusetts corporation in July 1970, and its affairs were dominated by Donald Foster. It was not affiliated or associated with any other *281 church, ecclesiastical body, or religious organization, and purported to be non-denominational. Until some time in 1972, meetings or services were held in Foster's apartment. In 1972 and for some months into 1973, services were held successively at several storefront locations. The Church allegedly had a membership of from 50 to 70, many of them being Foster's relatives. The Church's property consisted of a podium, 75 folding chairs (acquired second-hand), 100 Bibles, 2 space heaters, and 2 fans. [2]
There was a radical change in the operations of the Church after Foster's death in December 1973 when petitioner assumed sole control over the Church. Foster's wife (Nancy) and Kenneth Sharron, two of the three original officers of the Church had ceased their association with the Church. Nancy subsequently remarried and left that part of the country; and Sharron was "devoting all of his time to book making". Services were no longer held at the storefront *282 locations. The physical assets of the Church, noted above, had disappeared or had been disposed of. The Bibles had been returned to the Gideons. None of these assets came into petitioner's hands. Nor is there any evidence that either petitioner or anyone else representing the Church ever received any funds from Foster's Church account. Throughout 1974, the only services conducted were held in petitioner's apartment. Petitioner testified that there were 15 members, that "[ten,] fifteen" came to his residence for services, but he could identify only four persons (apart from himself and his wife) who had been present at the services the week preceding the trial. No list of members was maintained, notwithstanding a requirement of the by-laws that written notices of meetings were to be sent to the members. The so-called weekly service was brief, consisting of at most a 10-minute sermon, Bible reading, and meditation. Although petitioner was "minister", he had never performed any marriages, or officiated at any Baptisms, confirmations, or funerals. On their 1974 individual income tax return, petitioners deducted $13,700 for cash contributions purportedly made to the Church *283 of Eternal Hope. The claimed deduction was based upon petitioner's deposits of his earnings as a salesman into his so-called Church account. The Commissioner disallowed the deduction. OPINION Petitioners contend that they are entitled to deduct as charitable contributions Mr. Manson's deposits of some $13,700 into the so-called Church account. Such deposits had their source in his earnings as a salesman. The account was under his plenary control, and he used it as his personal account to pay for the entire range of living expenses of himself and his wife as well as for at least some of the business expenses incurred by him in his activities as a salesman. In order to be entitled to any deduction for a charitable contribution for religious purposes under section 170(a) of the 1954 Code, petitioners must demonstrate (1) that they actually made a contribution to the Church, and (2) that the Church is an entity "organized and operated exclusively for religious * * * purposes * * * no part of the net earnings of which inures to the benefit of any private shareholder or individual". Section 170(c)(2), I.R.C. 1954. See Calvin K. of Oakknoll v. Commissioner,69 T.C. 770, 772 (1978), *284 affd. 603 F. 2d 211 (2d Cir.), cert. denied 444 U.S. 872 (1979). We hold that petitioners have failed to satisfy that burden, and that indeed the record affirmatively discloses that no such deductions are allowable here. In the first place, the deposits can hardly be classified as contributions at all. Petitioner admitted at the trial that the account was in effect a substitute for his personal checking account which he had previously maintained. He used it for his own private purposes in the same manner that he had used the predecessor account. In making the deposits here in issue he was not making contributions to any church. Moreover, the claimed deductions are not allowable because the Church was in any event not a bona fide religious organization during the tax year, 1974. Petitioner used it primarily as his incorporated (religious) pocketbook. While it is true that there was some endeavor to clothe it in religious trappings, the fact is that the religious aspects of the Church were of comparatively minor consequence at least after Foster's death; instead, the primary purpose for its continued existence was to give colorable justification *285 for Mr. Manson's attempt to insulate a substantial portion of his salesman's earnings from taxation. [3] Petitioner's testimony before us was often vague and inconsistent. We were left with the definite conviction that the Church was being used by him predominantly for personal purposes, and that any religious activities connected with it were of minimal significance.It did not qualify as an exempt organization during the taxable year, 1974. Cf. Founding Church of Scientology v. United States,412 F. 2d 1197, 1200 (Ct. Cl. 1969), cert. denied 397 U.S. 1009 (1970); Basic Bible Church v. Commissioner, 74 T.C.    ,     (July 28, 1980); Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C.    ,     (June 9, 1980), on appeal (9th Cir. July 7, 1980); Unitary Mission Church v. Commissioner, 74 T.C.    ,     (June 3, 1980), on appeal (2d Cir. July 31, 1980). Petitioner's "contributions" to the Church were therefore not deductible. *286 In order to give effect to agreement of the parties as to certain other adjustments made by the Commissioner, Decision will be entered under Rule 155. Footnotes
1. The terms church, minister, bishop, and the like, are used herein merely for convenience to refer to the particular entity or person involved. No finding is made herein that any such entity or person is accurately described by such terms, or, for example, that the Church of Eternal Hope of Springfield, Mass., was a bona fide church during the taxable year 1974, or that petitioner was then a bona fide minister.↩
2. Although petitioner testified that the Church also owned the three automobiles used by him and his wife, we did not believe him, notwithstanding that they were registered in the name of the Church. They were his automobiles.↩
3. Moreover, even if deductions were allowable in respect of the amount claimed as a contribution to the Church, the record offers no explanation of petitioner's failure to report as income the amounts he received from the Church account for payment of personal expenses. Thus, even if the Church qualified as a tax-exempt organization pursuant to sec. 501, I.R.C. 1954, this would not excuse petitioner from reporting as income the amounts received from the Church as compensation for services, with the possible exception of amounts received as rental allowances, sec. 107,     I.R.C. 1954. Cf. Parker v. Commissioner,365 F. 2d 792, 799 (8th Cir. 1966), cert. denied 385 U.S. 1026↩ (1967).