EMANUEL H. BRONNER, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent *
Bronner v. Commissioner
Docket No. 4016-77.
United States Tax Court
T.C. Memo 1983-91; 1983 Tax Ct. Memo LEXIS 698; 45 T.C.M. (CCH) 738; T.C.M. (RIA) 83091; February 9, 1983. Peter R. Stromer and Norma R. Bell, for the petitioner. M. K. Mortensen, for the respondent. WILBUR
MEMORANDUM FINDINGS OF FACT AND OPINION WILBUR, Judge: Respondent determined the following deficiencies and additions to tax in theincome tax of Emanuel E. Bronner: Additions Under
Deficiency
Sec. 6651(a)
Sec. 6653(a)
Sec. 6654
1971
$5,888
$1,571
$491
$192
1972
17,551
4,403
1,245
548
1973
200,749
10,048
10,150
6,438
After concessions by the respondent, the issues remaining for our decision are: (1) Whether income from the production and sale of Dr. Bronner's Peppermint-Oil Soap and seasoning salt belongs to the petitioner or to his church, the All-One Faith in One-God State Universal Life *702 Church; (hereinafter All-One); (2) Whether contributions to All-One are deductible under section 170(a); [1]
(3) Whether taxable income generated by the soap business should be increased by $260,000 to reflect the closing inventory in December 1973 and the consequent decrease in cost of goods sold; (4) Whether petitioner is entitled to claim an ordinary loss of $129,769 from 1973 commodity transactions; (5) Whether petitioner is entitled to a dependency exemption for his daughter; (6) Whether petitioner is liable under section 6651(a) for failure to file timely returns in 1971, 1972, and 1973; (7) Whether petitioner is liable under section 6653(a) for negligent or intentional underpayment of tax in 1971, 1972, and 1973, and (8) Whether petitioner is liable under section 6654(a) for underpayment of estimated tax in 1971, 1972, and 1973. FINDINGS OF FACT--GENERAL Some of the facts have been stipulated and are so found. The stipulation of facts and the exhibits attached thereto are incorporated by this reference. Petitioner Emanuel H. Bronner resided in Escondido, *703 California when he filed the returns at issue in this case. The returns for 1971, 1972, and 1973 were first filed on April 25, 1974; amended returns for those years were filed on July 3, 1975. Respondent mailed a notice of deficiency to petitioner in February 1977, containing adjustments to income for the years 1963-1973. Only the years 1971-1973 are at issue in the present proceeding. Petitioner Emanuel H. Bronner is a rabbi and spiritual leader. In the 1940's and 1950's he gave weekly lectures at the Embassy Auditorium in Los Angeles in which he discussed religious and philosophical topics. In the early 1960's petitioner moved to Escondido, California, and began conducting his meetings there. Most of the meetings were informal, open discussions that took place at the Bronner's home. He also lectured at various locations throughout the years at issue here. In 1971 petitioner was ordained as a minister of the Universal Life Church (ULC), an organization located in Modesto, California. The ordination process was simple: petitioner mailed his application to the ULC and that organization then returned his "ministers credentials" to him by mail, without questioning his *704 faith or requiring any fee. Once a minister, Dr. Bronner was eligible to charter a church. [2] He did this in April of 1971, and called his new organization the All-One-Faith in One God State Universal Life Church. To maintain the charter, the minister was required to make quarterly reports of how many meetings had been held, how many people had attended, how much money the church had collected, and how much it had spent. The ULC required its charter church ministers to believe in "that which is right," but otherwise exerted little or no control over them or their congregations. In 1973 petitioner incorporated his church as a California non-profit organization. Petitioner, his son James Bronner, and his attorney Peter Stromer were the incorporators and directors of All-One; all three continue to serve as the board of directors. The officers of All-One are Dr. Bronner, president; James Bronner, vice-president; and Gladys Bronner, secretary-treasurer. Dr. Bronner used a variety of names for his organization over the years, and also had a variety of phrases describing his principles. [3] His basic belief, *705 however, remained constant. He felt that different religions led to unnecessary strife and war, so supported the idea of one all-encompassing faith. [4] He believed that one principal--the "moral ABC"--underlay the philosophies of the great religious leaders, so in his teachings he urged a return to that basic tenet. Dr. Bronner also espoused more worldly principles in his lectures and activities. His projects included mounting a campaign against water fluoridation, patenting an Essene birth control method, sending wires to Khruschev and leaders in Washington to protest the spread of communism, and campaigning actively for free speech. *706 Issue 1: The Taxable Person
Findings of Fact The petitioner descends from a family of chemists and, in keeping with that tradition, manufactures and sells soaps. The most popular kind is Dr. Bronner's Peppermint Oil Pure Castile Soap. Sanitek, a corporation of which James Bronner, petitioner's son, is vice-president, manufactures a base soap to the specifications of Dr. Bronner who then supplies the remaining ingredients, bottles the soap, adds a label, and markets the product, primarily in health food stores. The formulas and processes used in the manufacture of the product were developed by Dr. Bronner; only he and his son James know their contents. [5]
The soap business was related to the All-One Church because the principles of the religion were printed on the soap label. Merely reading the label one could learn about topics ranging from the moral ABC to the virtue of hard work, to the falsity of Marx's teachings. These labels were a kind of Bible to Dr. *707 Bronner's organization, yet unlike a Bible, they were revised frequently as his ideas changed and developed. [6]
The soap labels were also used for informal proselytizing. Many of Dr. Bronner's followers first learned of him when, after buying the soap and reading the label, they called, wrote, or visited Escondido to discuss the ideas that had piqued their interest. Dr. Bronner, did not, however, attempt to promote his product at his religious meetings, nor did he advertise commercially. Petitioner first filed returns for the years 1971, 1972, and 1973 in April 1974. All three returns included a Schedule C "Profit (or loss) from Business or Profession" form on which Dr. Bronner listed his principal business or activity as the wholesale of soap. In July 1975 petitioner filed amended returns for those years. He explained the change with the following statement: *708 The taxpayer hereby amends his 1971 income tax return to eliminate income and deductions of the All-One-Faith-In-One-God State Universal Life Church, Modesto, Calif. which is exempt from Federal income tax pursuant to IRC section 501(c)(3). At trial and on brief petitioner adheres to his contention that the income belongs to the church rather than to him individually. In conducting the soap business, petitioner drew no distinction between himself and his church; in his mind, they were one and the same entity. [7] Business with outside parties was conducted in Dr. Bronner's name, in that of E. H. Bronner and Associates, or in that of the church. Payment for most business items was made by checks drawn on the church account, yet Dr. Bronner included the value of the business assets on personal financial statements submitted to various banks in 1973, [8] and left them, along with his personal possessions, to his son James in wills drafted in 1970 and 1971. At least some of the business profits were used for church-related projects, including the printing of labels, scrolls, and membership cards.Petitioner handled all of the church funds himself, and made *709 all final decisions on how they would be spent. In 1974 the Internal Revenue Service mailed petitioner a notice of deficiency covering the years 1963-1970. Petitioner failed to respond to the notice, and also failed to pay the assessments. Soon thereafter two San Diego IRS officers levied on the All-One bank account. The church then commenced an action in the Federal District Court, Southern District of California, against the United States and the two revenue officers. After various pre-trial motions, the court addressed the plaintiff's claim that the church's bank account had been wrongfully seized for satisfaction of Federal income taxes owed by Dr. Emanuel Bronner, petitioner herein. *710 In a pre-trial conference order Judge Enright determined that the issues for resolution included (1) whether the plaintiff [All-One] held the bank account as the alter ego or nominee of the taxpayer [Bronner]; and (2) whether the taxpayer owned the "trade secrets (formulas, processes, and patent applications) by which the monies which had been deposited in the bank account arose." In the decision, All One Faith in One God State Universal Life Church, Inc. v. United States,38 AFTR 2d 5005, 76-1 USTC par. 9409 (S.D. Cal. 1976), the court held that Emanuel Bronner retained dominion and control over the trade secrets and the business operations prior to the levy [April 10, 1974] and treated all of the plaintiff's properties as though they were his own.
Emanuel H. Bronner owned the trade secrets and the concomitant right to receive the proceeds resulting from his trade secrets * * *. The District Court also found as a fact that Dr. Bronner had commingled his property with that of All-One, and that he had made no attempt to segregate his personal financial activities from those of his church or his business. Although petitioner was not a named party *711 in the All-One proceeding, he was closely involved with the litigation as he is in all church matters. He was the chief officer of All-One from 1971 through 1974 and made all decisions regarding its expenditures. He was billed for the legal services rendered by the church's attorney in that litigation. By way of amended answer to the petition herein, respondent asserted that petitioner was collaterally estopped to deny that he owned the trade secrets of the soap business and that he commingled his assets with those of All-One. Issue I: OPINION Petitioner is a rabbi and soap maker who combined his two passions by espousing his religious principles on the labels of his soap products. He also gave lectures, performed marriages, and engaged in other religious and political activities. He first filed income tax returns for the years 1971-1973 in late 1974. In 1975 he amended those returns, alleging that most of the income originally reported as his own in fact belonged to the church. We are asked to decide, initially, to whom the income is taxable. In 1974 the Internal Revenue Service attempted to collect an assessment for petitioner's unpaid taxes for the years 1963-1970.Unable *712 to find assets in Dr. Bronner's name, the revenue agents levied on the bank account of All-One. The District Court held that the levy was valid, based upon its finding that the trade secrets that generated the income in the account were owned by Dr. Bronner. All One Faith in One God State Universal Life Church, Inc. v. United States, supra.
The first issue for our decision is whether petitioner owned the operations and assets of the soap business and is therefore taxable on that income. Petitioner contends that the business is a church business, that the income belongs to the church, and that because the church is exempt from tax under section 501(c)(3), no tax is due. Respondent, however, maintains that this is Dr. Bronner's income. In support of this contention he relies primarily on the doctrine of collateral estoppel. He also asserts that there is no reliable evidence to support All-One's claim of ownership. We agree with respondent. We begin our analysis with the long standing principle that income from property is taxable to the owner of that property. Corliss v. Bowers,281 U.S. 376 (1930). The determination of who owns the assets *713 and operations of the soap business is, therefore, critical to our resolution of this issue. The success of Dr. Bronner's soap business depended in large part upon the secret formulas and processes developed by the petitioner for the manufacture of his soap. Only Dr. Bronner and his son are privy to these valuable formulas, which are trade secrets within the definition of the Restatement of Torts, sec. 757, comment (b) (1939). [9] Trade secrets are a form of intellectual property, Kewanee Oil Co. v. Bicron Corp.,416 U.S. 470, 475 (1974), and thus fall within the scope of the Corliss rule. Petitioner contends that the All-One Church owned these trade secrets, but in light of the holding in All-One,supra, we find that the doctrine of collateral estoppel bars us from redetermining that issue. *714 Collateral estoppel, like res judicata, is rule designed to avoid repetitious litigation.In essence, the doctrine holds that once an issue has been resolved by a judgment on the merits, that issue is settled as to the litigants involved and to parties in privity with them. In Commissioner v. Sunnen,333 U.S. 591, 601 (1948), the Supreme Court stated that in tax litigation "[W]here a question of fact essential to the judgmet is actually litigated and determined in the first tax proceeding, the parties are bound by that determination in a subsequent proceeding even though the cause of action is different." This first requirement for application of the doctrine--a final determination of fact common to both proceedings--was made explicit by this Court in Amos v. Commissoner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). We stated that if a fact is to be conclusively established in the second suit, "determination of that fact must have been necessary or essential to the result in the first suit and the fact in question must be an 'ultimate' fact for determination in the second suit." Amos v. Commissioner,supra, at 54. *715 The second major requirement for application of the doctrine is that the parties to the second suit be the same as, or in privity with, the parties in the first. This standard is designed to ensure that both parties had a full and fair chance to litigate the issue in question. In certain instances, a party not technically in privity will nonetheless be estopped by the first judgment if the court determines that the person controlled or substantially participated in the prior litigation.Restatement, Judgments 2d, sec, 39; (1982); 1B Moore, Federal Practice, par. 0.411[6], pp. 1551-1576 (2d ed. 1982). Finally, the party relying on the estoppel must demonstrate that there has been no change in material circumstances--factual or legal--which would require that the issue be redetermined. Commissioner v. Sunnen,supra.
The first requirement for collateral estoppel has been met in the instant case. In the wrongful levy action, the decision rested upon a determination of who owned the property giving rise to funds in the All-One account. In this action, our decision turns on resolution of the same question: if Dr. Bronner owns the trade secrets, he will be *716 taxable on the income from the soap business. This issue of ownership was clearly "essential" to the first action and is an "ultimate fact" in this second proceeding. Amos v. Commissioner,supra.
Privity of parties also exists. There is little doubt but that the Commissioner of Internal Revenue is a party in privity with the United States, the named defendant in the first proceeding. Sunshine Anthracite Coal Co. v. Adkins,310 U.S. 381 (1940). The more thorny question, of course, is whether Dr. Bronner, petitioner herein, is to be treated as a party or one in privity with a party, since All-One was the named plaintiff in that proceeding. Based upon several cases holding that a person who participated in, yet was not a formal party to, the first suit may be estopped by the judgment, we find that Dr. Bronner is bound. There are generally two requirements for such an estoppel. First, the non-party's interest in he first suit must have been sufficient to ensure that the issue was fully and and fairly litigated.Interests have been deemed sufficient when the non-party has a legal right, interest, or duty which is dependent on a question of *717 fact at issue. Moore, supra at 1557-1560; Restatement, Judgments 2d, sec. 39, Reporter's Note, Comment (a) (sec. 83 Tent. Draft No. 2 (1980)). Second, the non-party must have had control of the first suit if he or she is to be bound. Control has been found where the party to be bound has the power to choose which of several legal theories to use, or the power to decide whether or not to appeal a decision. Restatement, Judgments 2d, sec. 39. Whether these requirements have been met is a question of fact, to be decided with the purposes of the doctrine in mind. As the Supreme Court observed in Montana v.United States,440 U.S. 147, 154 (1979): [T]he persons for whose benefit and at whose direction a cause of action is litigated cannot be said to be "strangers to the cause * * *. [O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or who assists in the prosecution or defense of an action in aid of some interest of his own * * * is as much bound * * * as he would be if he had been a party to the record." * * * citing *718 Souffront v. Compagnie des Sucreries,217 U.S. 475, 486-87 (1910). We hold that Emanuel Bronner, petitioner herein, is bound by the determination in All-One Faith in One-God State Universal Life Church v. United States,38 AFTR 2d 5005, 76-1 USTC par. 9409 (S.D.Cal. 1976). Dr. Bronner's legal duty to pay tax, and legal right to claim the proceeds of the soap business was dependent on the outcome of that suit. He effectively controlled that litigation, as he controls all affairs of the church. Finally, he clearly is not "a stranger to the cause," so we find no inequity in binding him by that determination. The third requirement of collateral estoppel is also met here. Petitioner alleges that new facts exist, and that we are therefore precluded from applying the doctrine of collateral estoppel. He has neglected, however, to tell us what these new facts are, and our examination of the record reveals no hint of them. To the contrary, one finds that the pattern of commingling assets and treating church and personal business as inseparable continued at least until 1974.On this record we cannot find that redetermination is warranted.The requirements *719 or collateral estoppel having been met, we hold that petitioner Bronner owned the trade secrets of the soap business. Additionally, even if petitioner were not collaterally estopped, we would reach the same conclusion on the record before us. Dr. Bronner testified that only he and his son James knew the secret formulas and processes used in the soap business. In various loan applications made during the years in question petitioner treated the assets as his own. In wills executed in 1970 and 1971 petitioner left "100% of my business, products, formulas, patents, product royalties, plant and land to Sanitek chemist James A. Bronner." Petitioner maintains, as he has since amending his returns in 1975, that the soap business, and therefore the income, belongs to the church. Even assuming arguendo, that the business assets were owned by the church, they nonetheless remained subject to petitioner's control, since he directed all the church activities. This control is sufficient to make Dr. Bronner liable for taxes on income generated by the business: The income that is subject to a man's unfettered command and that he is free to enjoy at his own option may be taxed to him as *720 income, whether he sees fit to enjoy it or not. * * * [10] [Corliss v. Bowers,281 U.S. 376, 378 (1930).] Issue 2: Contributions to All-One
Findings of Fact On his Federal income tax returns for the years 1971, 1972, and 1973 petitioner claimed deductions under section 170 for gifts made to the All-One-Faith in One God State Universal Life Church. That church has never applied for a declaration of its tax-exempt status under section 501(c)(3), nor has it ever filed any Federal income tax returns. [11]
*721 In April 1971 All-One received a church charter from the Universal Life Church of Modesto, California. All-One's minister, petitioner Bronner, was required to make quarterly reports of its activities to ULC headquarters, but otherwise was independent of the main church. No records were kept of church income or expenditures. [12] Large amounts of money flowed through the All-One bank account at the Southern California First National Bank, but the source of the funds is unknown. Many of the checks drawn on the account were payable to suppliers and employees of Dr. Bronner's soap business. Others were payable to members of his family. Petitioner had final authority on all church matters. He determined how the church would spend its money and what projects it would take on. Only his signature appears on church checks. Dr. Bronner drew no distinction *722 between church assets and his personal assets. He used church fund for his personal Christmas gifts in 1971; he claims to have reimbursed the church for these amounts, but his assertion stands unsubstantiated. Issue 2: OPINION The second issue for our decision is whether petitioner's contributions to All-One are deductible under section 170(a). Petitioner contends that they are, maintaining that All-One is an organized religious association and is therefore a qualified recipient of charitable gifts. Respondent, conversely, contends that All-One does not qualify under section 170(c)(2) because petitioner offered no evidence showing that it was organized and operated for exempt purposes, and because it engaged in activities prohibited by sections 170(c)(2)(C) and (D). We agree with respondent. Section 170(a) allows individuals to deduct any charitable contribution made within the taxable year. Charitable contributions are then defined as gifts made to organizations which are operated exclusively for exempt purposes, and which do not participate in certain prohibited activities. [13] Section 170(c). *723 As in all Tax Court proceedings, the petitioner bears the burden of proving that the respondent's deficiency notice is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. Petitioner has not met that burden. We note, first, that the status of All-One is neither dependent upon nor affected by the status of its chartering organization, the Universal Life Church. All-One is a legally distinct entity, and therefore must meet the requirements of section 170 independently. Basic Bible Church v. Commissioner,74 T.C 846, 855-856 (1980). [14]
The central requirement of section 170 is that the donee organization be operated exclusively for exempt purposes. In essence this means that its activities and funds must be dedicated to "public" purposes. On the record before us *724 we cannot conclude that petitioner has shown All-One's public orientation. The only evidence we have of All-One's expenditures is petitioner's uncorroborated testimony that the money was used for the church's religious projects. While petitioner maintains that these projects will redound to the benefit of all people, his opinions alone are not enough to convince us of that fact. We hold that he has failed to establish that All-One is operated exclusively for exempt purposes. Petitioner's failure to produce evidence regarding church income and expense also forecloses a finding that no part of the net earnings of the donee organization inured to the benefit of a private individual. To the contrary, the evidence before us shows unequivocally that petitioner commingled his assets with those of the church, often drawing on the church checking account for personal matters. Such personal benefit disqualifies gifts made to All-One from deductibility under section 170(a). Section 170(c)(2)(C); Founding Church of Scientology v. United States,188 Ct. Cl. 450, 412 F.2d 1197 (1969); Bubbling Well Church of UniversalLove,Inc. v. Commissioner,74 T.C. 531 (1980), *725 affd. 670 F.2d 104 (9th Cir. 1981). Issue 3: The Inventory Adjustment
FINDINGS OF FACT In the notice of deficiency respondent increased petitioner's taxable income for 1973 by $260,000. This reflected his determination that because the value of closing inventory had not been included in the calculation of cost of goods sold, petitioner had understated his 1973 income. Respondent obtained the figure of $260,000 from a loan application which petitioner submitted to a local bank in September 1973. No adjustments were made for the years 1971 or 1972. No actual physical inventory was taken of the soap business until December 1974, and the returns for years prior to that show no adjustments for either opening or closing inventory.Sometime after those returns were filed petitioner's accountant Mark Barker calculated inventory estimates for the years in question by working backward from the 1974 inventory and using the 4-year gross profit percentage as a basis for the computations. These calculations yielded an estimated opening inventory of $123,747 and closing inventory of $171,621 in 1973. According to these figures, the correct income adjustment for 1973 *726 is an increase of $47,874 rather than the $260,000 suggested by respondent. The schedule reflecting these and other computations was introduced at trial over respondent's objections. Issue 3: OPINION The next issue for our decision is whether petitioner's 1973 taxable income should be increased by $260,000, respondent's estimate of petitioner's closing inventory which was not included in computing cost of goods sold for that year. Petitioner maintains that the inventory was worth only $171,621 at the end of 1973, not $260,000 as contended by respondent. Petitioner arrives at his figure by using an accounting practice designed to estimate the value of an inventory when no actual measure in fact exists. Respondent contends that the schedule showing the results of petitioner's calculations in deriving the lower figure is inadmissible under the Federal Rules of Evidence, and that petitioner therefore failed to prove that respondent's figure is incorrect. Initially, we must determine if the schedule is admissible evidence. Respondent contends that it is not, relying on Rules 802 and 901, Fed. R. Evid. Rule 802 forbids use of hearsay evidence; *727 Rule 901 requires authentication of documents. The Commissioner argues that petitioner has no underlying records to support the schedule, and that if they do exist they were not made available as required by Rule 1006. We find these arguments unpersuasive. First, under the Federal Rules of Evidence a witness may authenticate an exhibit by testifying that it is what it purports to be. Rule 901(b)(1). Since Mr. Barker is the accountant who prepared the schedule in question, he was competent to authenticate it, and to testify as to its contents. For purposes of the inventory adjustment at issue here, the only relevant figures on the schedule are those showing Mr. Barker's calculations. He based these on the actual inventory taken in 1974 and on the overall gross profit percentage for the years 1971-1974. These computations are based on papers pertaining to the soap business which petitioner brought with him to trial but that are not in evidence.The schedule is, in essence, a summary of these papers and as such was admitted at trial under Rule 1006, Fed. R. Evid.[15]
*728 The next question is whether we are to accept respondent's inventory valuation and the concurrent adjustment which increases 1973 income by that amount, but makes no change in 1971 or 1972 income. Our other option is to accept petitioner's method which involves estimating inventory adjustment applicable to 1973. We find that petitioner's method more accurately reflects his true income, and accept his adjustment. Petitioner took no inventory of his business until 1974, and in calculating his cost of goods sold for the years 1971, 1972, and 1973 did not account for opening or closing inventories. Respondent, relying on a financial statement made by Dr. Bronner in 1973, adjusted his cost of goods sold for that year to reflect the $260,000 inventory petitioner claimed among his assets. Section 471 requires taxpayers to use the accounting method that "conform[s] as nearly as may be to the best accounting practice in the trade or business and as most clearly reflect[s] income." Obviously petitioner did not do this in filing his original or amended returns, since he took no account of inventory in calculating his cost of goods sold. However that statutory mandate must be our *729 guide in resolving this issue. We find that petitioner's inventory estimates more clearly reflect his income, and therefore accept those figures as the basis for our adjustment. His calculation is based on an actual inventory rather than the estimate used by respondent, and the method he uses in deriving inventory estimates for the earlier years is far more acceptable than the adjustment made by respondent. [16] Petitioner's figures also reflect true income more accurately because the adjustment includes opening as well as closing inventory figures. Petitioner's evidence convinces us that the respondent's determination is incorrect and must therefore be rejected. [17]
Issue 4: Commodities Losses
Findings of Fact During *730 the years in issue petitioner and All-One invested in the stock market. In 1973 they began investing in commodities as well, supposedly with hopes of protecting themselves against the rising cost of coconut oil, an ingredient in Dr. Bronner's soap. During 1973, petitioner had trading accounts with four different brokers, all listed in his name. Petitioner authorized the brokers to trade in coconut oil and silver, and gave them full discretion with his account.Two of the four brokers also bought and sold a wide variety of other commodities for the petitioner. [18] Because neither petitioner nor anyone else paid attention to the brokerage statements he received almost daily, he was not aware of the excessive unauthorized trading until July 1973. [19]
Petitioner sustained large *731 losses from the commodities investments in 1973. On his return petitioner reported half of the loss on Schedule D, and took a deduction of $1,000. He reported the other half on Schedule C as a business loss and deducted it in full. [20] The Commissioner challenged this deduction. The only commodity even remotely related to petitioner's business activities is coconut oil. At most only $32,000 of the totla loss was incurred in transactions in this commodity. [21]
*732 Petitioner normally did not buy coconut oil, since it was primarily used in the base soap prepared by Sanitek. The key ingredient, and the most costly, added by petitioner was peppermint oil. Issue 4: OPINION The next issue for our decision is whether petitioner may deduct a portion of his ommodities losses as an ordinary business loss. Peitioner maintains that since the losses were related to his business activities, they are deductible in full. Respondent claims that these were capital losses, and that the deduction is therefore limited to $1,000. We agree with respondent. Section 165(a) states the basic rule allowing a deduction for losses incurred within the taxable year. Section 165(c) narrows the deduction for individual taxpayers, permitting deduction only for losses incurred in a trade or business, a profit-making activity, or from a theft or casualty. When the loss is incurred on a capital asset, section 165(f) adopts the limitations set by sections 1211 and 1212; section 1211(b), in turn, allows capital losses "only to the extent of gain from such sales or exchanges, plus the taxable income of the taxpayer or $1,000, whichever is smaller." Section 1211(b). *733 Because different tax consequences flow from classification of the asset as either capital or ordinary, we must first determine into which class these commodities futures fall. The term "capital asset" is defined broadly in section 1221 to include all property except certain enumerated items, none of which is involved here. Commodities futures are therefore presumptively treated as capital assets meriting capital treatment.Cf. Muldrow v. Commissioner,38 T.C. 907 (1962). There are, however, two ways in which the nature of the futures contracts can be transformed, thus requiring ordinary treatment of gains and losses. First, under section 1233(g) transactions involving short sales merit ordinary treatment if the trader is engaged in bona fide hedging. Second, the doctrine enunciated by the Supreme Court in Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955), allows ordinary treatment for transactions that, while not bona fide hedges, involve products that are an "integral part" of the taxpayer's business. Petitioner fits within neither of these exceptions. Hedging is one of three categories into which commodities transactions *734 may be classified. The other two, speculation and capital transactions, generate capital gains or losses. United States v. New York Coffee & Sugar Exchange,263 U.S. 611 (1924). Cf. Covington v. Commissioner,42 B.T.A. 601 (1940), affd. on this issue 120 F.2d 768 (5th Cir. 1941); Battelle v. Commissioner,47 B.T.A. 117 (1942); Rev. Rul. 78-414, 1978-2 C.B. 214. In hedging, trading in the futures markets is part of an inventory purchase system, and gains and losses are accorded ordinary treatment. Corn Products Refining Co. v. Commissioner,215 F.2d 513, 516 (2d Cir. 1954), affd. 350 U.S. 46 (1955). In a bona fide hedge, a person whose business involves some item traded on the commodities market purchases futures of that commodity in an attempt to shift the risk of loss from price fluctuations to someone else. Sicanoff Vegetable Oil Corp. v. Commissioner,27 T.C. 1056, 1068 (1957), revd. on other grounds, 251 F.2d 764 (7th Cir. 1958). The result is that "forward sales prices are fixed and the relation between commodity purchase and later sales *735 price is insured against both increase and decrease of commodity prices." Corn Products Refining Co. v. Commissioner,215 F.2d 513, 516 (2d Cir. 1954). In bona fide hedges, the trader generally tries to maintain a balance between business needs and the position in futures. [22] This enables the trader to either take delivery under the futures contracts or to sell them out, depending upon the state of the market. A true hedger, therefore, will be able and willing to store and use the commodities represented by his market holdings. [23]
In this case petitioner has not produced one shred of evidence to support *736 a finding that he was hedging. He did not demonstrate that coconut oil was used in his business; to the contrary, both he and his son testified that they did not normally buy coconut oil. He did not demonstrate any attempt to maintain a balance between his actual needs and his position in futures; the unlimited discretion given his brokers indicates the absence of such a desire. Nor did petitioner demonstrate any intent to ever take actual delivery on the futures he purchased; his testimony that All-One usually bought no coconut oil indicates he would not have been able to store the oil. We conclude that petitioner was not a hedger and thus cannot transform his futures into ordinary income assets on the basis of section 1233(g). The second way to obtain ordinary treatment for trading is to fall within the doctrine enunciated in Corn Products Refining Co. v. Commissioner,350 U.S. 46 (1955).In that case the Supreme Court held that where one trades in a commodity integrally related to one's businesss, gain or loss will be ordinary because "Congress intended that profits and losses arising from the everyday operation of a business be considered as ordinary income *737 or loss rather than capital gain or loss. The preferential treatment provided by section 117 applies to transactions in property which are not the normal sorce of business income." Corn Products,supra at 52. The potentially broad expense of this ruling has been narrowed in recent years. Recently this Court held that the existence of a substantial investment motive along with a business motive rendered Corn Products inapplicable. W.W. Windle Co. v. Commissioner,65 T.C. 694 (1976), dismissed on other grounds, 550 F.2d 43 (1st Cir. 1977), cert. denied 431 U.S. 966 (1977). Dr. Bronner has failed to produce convincing evidence that coconut oil is integrally related to his business. In fact he himself testified that normally All-One does not buy that particular oil. While small amounts may be added along with the peppermint oil, there is no basis for concluding that he needed the 100 or 110 tank cars represented by the futures he purchased. Additionally, the authorization to trade in silver, combined with petitioner's substantial stock dealings in prior years, convinces us that a "substantial investment motive" *738 was involved in these commodities investments. Under W.W. Windle,supra, this motive bars application of the Corn Products doctrine. Being unconvinced that the coconut oil futures fall within any of the exceptions to section 1221, we must conclude that the losses were incurred in the sale or exchange of a capital asset. Section 165(f), read in conjunction with section 1211(b), therefore limits the deduction to $1,000 as contended by respondent. Issue 5: Dependency Deduction
FINDINGS OF FACT Petitioner's daughter, Ellen Bronner Spralin Yontz, resided with him in Escondido during 1971, 1972, and part of 1973. In 1973 she was moved to the Leslie Kirby Health Ranch. Dr. Bronner paid for her upkeep at the ranch in cash and various health food products used by the manager of the ranch. [24] His daughter was in her 30's at this time. [25]
*739 Issue 5: OPINION We are next asked to decide whether petitioner is entitled to a dependency exemption for his daughter. Respondent disallowed it in all 3 years, contending that petitioner failed to show that he provided over half of her support. Petitioner claims that he was her sole source of support during the years at issue. We agree with respondent. Petitioner bears the burden of proving that the Commissioner's determination is incorrect. Welch v. Helvering,290 U.S. 111 (1933); Rule 142(a), Tax Court Rules of Practice and Procedure. The only evidence petitioner offered on this issue was his uncorroborated [26] testimony that his daughter lived with him until "she became unmanageable", allegedly sometime in 1973 or 1974.
In light of the fact that petitioner's daughter was in her 30's at this time, we cannot presume, in the total absence of evidence, that she did not work, had no other source of income, and *740 that her father did in fact provide more than half of her support during the years in question. Accordingly, we find that petitioner's deduction must be denied. Issues 6, 7, 8: Additions to Tax
FINDINGS OF FACT Petitioner has kept virtually no records of either his personal expenses or those of All-One. Petitioner did employ various accountants and lawyers during the years in question. A Mr. Munsell prepared the original returns for the years 1971, 1972 and 1973. These were filed on April 25, 1974. He used certain work papers prepared by Lloyd Henry, a C.P.A., in preparing that return. Mark Barker, also a C.P.A., was hired by Dr. Bronner and Peter Stromer, petitioner's attorney, to amend the returns; he also relied on some of Henry's work papers. Petitioner retained ultimate control over these employees, as he did in all church affairs. Petitioner never filed a declaration of estimated tax, nor did he ever pay such a tax. OPINION Issue 6
Respondent has assessed additions against petitioner under section 6651(a) for failure to file timely returns in the years 1971, 1972 and 1973. In his petition, the taxpayer alleges that there was reasonable cause for *741 the delay in filing. Dr. Bronner has not convinced us that the delay is excusable, and we therefore uphold respondent's determination. Section 6651(a) imposes an addition on all persons who fail to file an income tax return on the prescribed date "unless it is shown that such failure is due to reasonable cause and not due to willful neglect." The regulations clarify that the taxpayer must make an affirmative showing of facts indicating reasonable cause if he or she is to be exonerated. Section 301.6651-1(c), Income Tax Regs.
Petitioner has presented no evidence whatsoever that can excuse his untimely filing in the years in question. Petitioner's only reference to the addition is a statement in the petition that Petitioner is a blind religious leader, a rabbi, and chief presiding officer of a church. As such, he had reasonable cause to believe income attributed to him by the Commissioner was in reality income attributable to his church, and therefore exempt from filing requirements.
This naked statement is not adequate to meet petitioner's burden of proof. Bebb v. Commissioner,36 T.C. 170, 173 (1961). Issue 7
We are next asked to decide whether petitioner *742 is liable for an addition to tax under section 6653(a). Respondent maintains that petitioner's underpayment of tax was due to negligent or intentional disregard of rules and regulations. Petitioner believes that his underpayment is excusable since he reasonably believed that the soap business income was attributable to the church rather than to him personally. We agree with respondent. Petitioner bears the burden of showing that the additions to tax found by the Commissioner are not warranted. Bixby v. Commissioner,58 T.C. 757, 791 (1972); Rule 142(a). He has, however, offered virtually no evidence to demonstrate the use of reasonable care in preparing his returns. Petitioner kept inadequate books and records, failed to take yearly inventory, and in general ignored the requirement that he account for and make returns of his income.Additionally, petitioner stated at trial that once he become a rabbi he "did insist on discontinuing paying taxes * * * because I did my work in the name of--in the face of the Lord." In light of these facts and petitioner's lack of proof we find the petitioner liable for additions to tax under section 6653(a). Issue 8
*743 Finally, we are asked to decide whether petitioner is liable for the additions prescribed by section 6654 for his underpayment of estimated tax in the years in question. Respondent contends that because income from the soap business is attributable to petitioner, he is liable for estimated income tax under section 6015. He failed to pay that tax, respondent continues, and is therefore subject to the addition provided by section 6654. In response, petitioner again relies upon his contention that the income belongs to the church, is exempt from income tax under section 501(c)(3), and that the exemption extends to estimated taxes imposed by section 6015. We have found that the business income was clearly taxable to petitioner and agree with respondent that Dr. Bronner's failure to pay the estimated tax subjects him to the additions imposed by section 6654. Section 6015 requires individuals who expect to receive more than $500 from sources other than wages to make a declaration of estimated income tax. Section 6153 sets out the payment schedule for those required to declare and pay the tax. Section 6654 provides a mandatory addition for any underpayment. The soap business *744 income was attributable to Dr. Bronner, and it is clear that he received more than $500 from sources other than wages and was therefore required to declare and pay estimated tax. He did neither, and is liable for additions under section 6654. Grosshandler v. Commissioner,75 T.C. 1 (1980). Decision will be entered under Rule 155.
Footnotes
*. The trial in this case was conducted by the Honorable William H. Quealy who retired before rendering a decision. It was reassigned to Judge Richard C. Wilbur for decision.↩
1. All section references are to the Internal Revenue Code of 1954, unless otherwise indicated.↩
2. We use the term "church" herein for purposes of convenience only.↩
3. James Bronner testified at trial that in the 1940's earlier organizations referred to as his church were called the Brotherhood of Man, or in the 1950's and 1960's as the Better Health Foundation. Petitioner's slogan was originally "one full truth religion, not communism"; in the 1970's he preached the "moral ABC." ↩
4. Several witnesses testified to the universal nature of petitioner's principles, and stated that they did not conflict with other religions in which they were involved, including Mormonism, Lutheranism, and Catholicism.↩
5. Petitioner allegedly transferred the trade secrets to the All-One corporation in 1974. This transfer, if effective at all, does not affect our decision here since it occurred after the years in question.↩
6. At trial, Elizabeth Hubner testified that the soap label was revised constantly, and that petitioner "changed the soap label whenever he thought something could be better said than it was expressed." Park Youree, a printer, said that there were thousands of changes in the label, sometimes "many times a day."↩
7. James Bronner testified that "the church and my father have been one person." ↩
8. Dr. Bronner applied to three banks for loans in the fall of 1973. On the August 1, 1973 application to Southern California First National Bank, the total assets were reported at $982,400; the September 1973 statement showed the figure of $710,800, while an application to Home Federal Savings & Loan submitted in December 1973 totalled a mere $426,000. These differences were not explained by the petitioner.↩
9. The Restatement says that A trade secret may consist of any formula, pattern, device, or compilation of information which is used in one's business, and which gives him an opportunity to obtain an advantage over competitors who do not know or use it. It may be a formula for a chemical compound, a process of manufacturing, treating or preserving materials, a pattern for a machine or other device * * *.↩
10. Our finding for the respondent is also mandated by Tax Court Rule 142(a)↩ which places the burden of proof on the taxpayer. Dr. Bronner has offered virtually no evidence showing that the church alone owned or controlled the soap business. Absent such facts, we are bound to uphold the Commissioner's determination.
11. The All-One church did file a California Corporation Franchise Tax Return in 1974 covering the period September 4, 1973 through December 31, 1973.That return stated that All-One had no net income for state tax purposes. Under Cal. Rev. & Tax. Code secs. 23701 and 23701d↩ (West 1979), the income of religious organizations is exempt from the corporation franchise tax.We do not know if All-One ever applied for or received the requisite determination of exemption from the Corporation Franchise Tax Board.
12. A selected set of checks and a summary of those checks were offered as joint exhibits. Many of the checks contained handwritten notations describing what the funds were used for.Respondent expressly declined to stipulate to the validity of these descriptions and absent corroborating evidence, we cannot rely on them.↩
13. SEC. 170(c)(2) reads as follows: (c) CHARITABLE CONTRIBUTION DEFINED.--For purposes of this section, the term "charitable contribution" means a contribution or gift to or for the use of-- (2) A corporation, trust, or community chest, fund, or foundation-- (A) created or organized in the United States or in any possession thereof, or under the law of the United States, any State, the District of Columbia, or any possession of the United States; (B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes; (C) no part of the net earnings of which inures to the benefit of any private shareholder or individual; and (D) no substantial part of the activities of which is carrying on propaganda, or otherwise attempting, to influence legislation, and which does not participate in, or intervene in (including the publishing or distributing of statements), any political campaign on behalf of any candidate for public office. A contribution or gift by a corporation to a trust, chest, fund, or foundation shall be deductible by reason of this paragraph only if it is to be used within the United States or any of its possessions exclusively for purposes specified in subparagraph (B).↩
14. See also Owens v. Commissioner,T.C. Memo. 1982-671; Mustain v. Commissioner,T.C. Memo. 1982-670; Hall v. Commissioner,T.C. Memo. 1982-337; Schilberg v. Commissioner,T.C. Memo. 1982-336; Riemers v. Commissioner,T.C. Memo. 1981-456↩.
15. Barker testified that some of the figures in the summary were taken from the returns prepared by Mr. Munsell. We agree with respondent that these figures are hearsay. However, those portions of the summary are not germane to the inventory adjustment, and can, in our opinion, safely be disregarded.↩
16. We note in passing that Mr. Mortensen, attorney for the respondent, stated at trial that he had "no problem with the methodology, as long as the figures are correct." ↩
17. We note that it was only for 1973 that the inventory issue is before the Court. As to that year, we find petitioner's method clearly superior to respondent's method which simply makes an adjustment to closing inventory with a corresponding decrease in cost of goods sold.↩
18. A third broker made three isolated purchases of potatoes, but otherwise traded only in coconut oil and silver. ↩
19. At trial and on brief petitioner claims that some of the losses should be deductible as theft losses under section 165(c) because they stemmed from illegal churning and trading by the brokers. This issue was not properly before the Court, thus we will not consider it in our decision.↩
20. Petitioner's accountant testified that the total loss sustained in 1973 was $259,537. Only the portion reported on Schedule C--$129,769--is at issue in this proceeding.↩
21. The $32,000 figure appears on a schedule admitted as evidence at trial. Petitioner's accountant testified that this schedule was a summary of work papers of Lloyd Henry, a C.P.A. who had once worked for the church.The schedule was admitted over respondent's objection and subject to his right to go back to the records from which the summary was prepared to determine its accuracy. On brief respondent contends that the 1973 trading in coconut oil resulted not in a loss, but in a net gain to petitioner of $15,644, relying on joint exhibit 32-AF, a summary of petitioner's gains and losses at the four brokerage houses. We express no opinion as to whether or not a loss was in fact sustained, since in his notice of deficiency respondent did not challenge the amount of the loss, but only the propriety of taking the loss as an ordinary deduction.↩
22. In Oringderff v. Commissioner,     F.2d     (10th Cir. 1981), 48 AFTR 2d 81↩-5908, 81-2 USTC par. 9642, affg. a Memorandum Opinion of this Court, the Court cited the large disparity between the taxpayer's actual needs and his position in the futures market as a factor showing that the investments were speculative and not bona fide hedges. 23. In Lewis v. Commissioner,T.C. Memo. 1980-334↩ the Court cited the lack of intent to take delivery as a factor showing that the trader was not engaged in bona fide hedging.
24. The unity of Dr. Bronner and his church is also demonstrated in petitioner's testimony regarding his daughter. He testified that "I was her--certainly, her sole support," yet he admitted moments later that the health foods given to the manager came from the church. ↩
25. Petitioner never testified or stipulated to his daughter's age. However in a loan application submitted in 1964 he stated that he had one daughter age 28, and noted that she was handicapped. This application was admitted as a joint exhibit at trial.↩
26. At trial petitioner's son James Bronner testified that he "believed" his sister had resided with the taxpayer in 1971 and 1972, but not in 1973. While this coincides with Dr. Bronner's testimony, James' memory was too hazy to be reliable.↩