T.C. Memo. 2013-283

UNITED STATES TAX COURT

THE COUNCIL FOR EDUCATION, Petitioner v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17890-11X.                    Filed December 16, 2013.

Harold R. Huggins (an officer), for petitioner.

Victoria A. Judson, Kirk M. Paxson, Patricia P. Wang, and Eugene Kim, for respondent.

MEMORANDUM OPINION

GUY, Special Trial Judge: Respondent determined that the Council for Education (petitioner) does not qualify for exemption from Federal income taxation pursuant to section 501(a) as an organization described in section

[*2] 501(c)(3).[1]  Petitioner challenged respondent's determination by timely filing a petition for declaratory judgment with the Court pursuant to section 7428(a).  At the time the petition was filed, petitioner's principal place of business was in California.

The parties agree that petitioner exhausted the administrative remedies available to it within the Internal Revenue Service (IRS).  The parties also filed with the Court the entire administrative record in accordance with Rule 217(b)(1).  For purposes of the instant proceeding, the facts and representations contained in the administrative record are accepted as true and are incorporated herein by reference.  See id.  Petitioner bears the burden of proving that respondent's determination is incorrect.  See Calhoun Acad. v. Commissioner, 94 T.C. 284, 295 (1990).

## Background

### I. Harold Huggins

Harold Huggins is petitioner's president and secretary and its sole officer, director, and employee.

---

[1]Unless otherwise indicated, section references are to the Internal Revenue Code (Code), as amended, and Rule references are to the Tax Court Rules of Practice and Procedure.

**[\*3]**   A.  <u>University of California at Santa Barbara</u>

Mr. Huggins was enrolled as a student at the University of California at Santa Barbara (UCSB) from 1991 to 1994.  By all indications, he did not graduate from UCSB.  He has been an active and vocal critic of the University of California (UC) university system generally and UCSB specifically.

B.  <u>Mr. Huggins' Administrative Complaints and Lawsuits</u>[2]

Between 1993 and 2002 Mr. Huggins filed (1) an administrative complaint with UC's vice chancellor for student affairs alleging academic fraud and civil rights violations; (2) an administrative complaint with the U.S. Department of Education's (DOE) Office for Civil Rights alleging that UCSB administrators and faculty discriminated against African American students by denying them "course repeats", violated the faculty code of conduct, and destroyed documents to conceal evidence of academic fraud; (3) a lawsuit in Federal District Court against the UC board of regents (board of regents) and the California Student Aid Commission (CSAC) alleging that his Federal student loans should be extinguished because he was given a poor grade in an engineering course at UCSB and university officials

---

[2]The administrative record does not include all of the pleadings and/or the final dispositions of lawsuits filed by Mr. Huggins (individually) and petitioner. However, because the lawsuits are discussed and described to varying degrees in the administrative record, we have taken judicial notice of certain opinions and orders issued by the Federal courts with jurisdiction over those actions.

**[*4]** violated the Racketeer Influenced and Corrupt Organizations Act (RICO);[3]

(4) a series of three lawsuits in Federal District Court against UCSB, numerous UCSB officials, the board of regents, and the Western Association of Schools and Colleges (WASC), alleging that the defendants coerced him into withdrawing from UCSB, extorted student loans through grade fraud and intimidation, and violated RICO and the False Claims Act.[4]

C. Proposition 209

Mr. Huggins is an opponent of Proposition 209, a ballot initiative that was passed by the voters of the State of California in November 1996. At the time, then Governor Pete Wilson endorsed Proposition 209, and Ward Connerly, a member of the board of regents, actively promoted the initiative.

---

[3]The lawsuit was dismissed on the grounds Mr. Huggins failed to allege a pattern of racketeering activity and failed to demonstrate a basis for a class action. See Huggins v. Univ. of Cal. at Santa Barbara, 21 Fed. Appx. 673 (9th Cir. 2001).

[4]The first lawsuit, assigned docket No. SACV 02-0360 DOC, was short lived inasmuch as the court denied Mr. Huggins' request to proceed in forma pauperis. The second lawsuit, assigned docket No. SACV 02-0610 DOC, was dismissed on a number of grounds including failure to state a claim for relief. The third lawsuit, assigned docket No. SACV 02-0810 DOC, was dismissed on the ground of res judicata. The District Court granted WASC's motion for sanctions and a separate motion to declare Mr. Huggins a vexatious litigant, and those actions were either left undisturbed or affirmed on appeal. See Huggins v. Hynes, 117 Fed. Appx. 517 (9th Cir. 2004).

**[*5]** Proposition 209 amended the California State constitution, see Cal. Const., art. I, sec. 31(a), to provide in relevant part: "The State shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." The practical effect of Proposition 209 was to eliminate race-based and gender-based affirmative action programs in public employment, education, and contracting in the State of California. The U.S. Court of Appeals for the Ninth Circuit has uniformly rejected claims that Proposition 209 is unconstitutional. See Coal. to Defend Affirmative Action v. Brown, 674 F.3d 1128 (9th Cir. 2012) (upholding the Court of Appeals' earlier opinion Coal. for Econ. Equity v. Wilson, 122 F.3d 692 (9th Cir. 1997)).

II. The Council for Education

A. Articles of Incorporation and Bylaws

In May 2006 Mr. Huggins organized petitioner as a California nonprofit mutual benefit corporation "to investigate academic fraud." Petitioner's articles of incorporation were amended in June 2009 to state in relevant part:

> This corporation is a nonprofit public benefit corporation and is not organized for the private gain of any person. It is organized under the Nonprofit Public Benefit Corporation Law for public and charitable purposes. The specific purpose of the corporation is to advocate for the legal rights of an unrepresented charitable class of federal student

[*6] loan recipients, and lenders of the Federal Family Education Loan Program (FFEL): 1.) Investigate State Administered Student Loan Programs on improprieties under the guidelines of the Higher Education Act[1]; 2.) Litigate for collateral restitution; 3.) Commission a public report on institutional misconduct; 4.) Reimburse members of the charitable class, and FFEL Lenders under the National Lenders' Assurance Program Center (NLAPC).[5]

> [1]Title 20 U.S.C. §§ 1082(o)

The administrative record includes two sets of bylaws for petitioner. The bylaws generally state that petitioner will investigate and report fraudulent activities relating to student loan programs, advocate for student loan recipients, and enforce DOE accreditation standards for all students regardless of race or ethnicity.

B. Petitioner's Administrative Complaints and Lawsuits

On September 8, 2006, petitioner filed an administrative complaint with the District of Columbia Department of Consumer and Regulatory Affairs alleging that the American Civil Rights Institute (ACRI) and the American Civil Rights

---

[5]The Federal Family Education Loan Program (FFELP), established under Part B of the Higher Education Act of 1965, see 20 U.S.C. secs. 1071-1087-4 (2006), comprises certain student loan programs administered by DOE, see 34 C.F.R. sec. 682 (2010). For a detailed description of the relationships between DOE, private lenders, and "Guaranty Agencies", see United States ex rel. Vigil v. Nelnet, Inc., 639 F.3d 791, 794-795 (8th Cir. 2011).

[*7] Coalition (ACRC)[6] failed to comply with certain regulations governing tax exempt organizations. The complaint was referred to the Office of the District Attorney for Sacramento, California. The district attorney subsequently informed petitioner that ACRI and ACRC officials were guilty of nothing more than an oversight in failing to pay required fees and in filing documents, and there was insufficient evidence to warrant filing a criminal complaint.

In December 2006 petitioner filed an administrative complaint concerning ACRI and ACRC with the IRS and the U.S. Department of Justice. The IRS informed petitioner that disclosure of any action that it might take against ACRI or ACRC would be prohibited.[7]

In February 2007 petitioner filed a request under the Freedom of Information Act with the U.S. Department of State requesting a report on the number of students from Canada, China, Hong Kong, South Korea, Singapore, and Taiwan that were issued visas between 1995 and 2005 to attend a college or university in California. The Department of State informed petitioner by letter that it did not maintain statistics for student visas by State or by academic institution.

---

[6]The record suggests that Mr. Connerly organized ACRI and ACRC in part to promote Proposition 209.

[7]The record does not reflect whether the Department of Justice acted on petitioner's information.

**[\*8]** In March 2007 petitioner filed an administrative complaint with the UC Academic Senate (UCAS). UCAS' attorney wrote a letter to petitioner stating that, much like a complaint that Mr. Huggins had filed with the UCSB Academic Senate in 2002, petitioner's complaint was defective because it was not limited solely to UCAS members and it did not specify the provisions of the Faculty Code of Conduct that each individual allegedly violated.

In April 2007 petitioner authorized "Special Committee 1868"[8] to gather evidence in support of a complaint alleging that Mr. Connerly (1) was acting as an unregistered foreign agent in violation of 18 U.S.C. section 951, (2) abused his position as a member of the board of regents by failing to disclose (a) that he had a personal financial interest in matters pending before the board, and (b) that he was affiliated with members of the California Civil Rights Initiative, and (3) organized ACRC and ACRI to deceive California voters and cause them to support activities of a foreign Government. In October 2007 Special Committee 1868 allocated funds to hire attorneys and an expert witness.

---

[8]The administrative record does not include any information regarding Special Committee 1868 such as the composition of its membership, the members' individual qualifications, or a general description of its operations.

**[*9]** In January 2008 petitioner's attorney, Alexander F. Annett, sent a letter to the IRS Whistleblower Office identifying potential discrepancies in respect of amounts that ACRC, ACRI, and a third entity, the American Civil Rights Foundation (ACRF), reported that they paid to Mr. Connerly in Forms 990, Return of Organization Exempt From Income Tax, for 2004, 2005, and 2006. At the same time, Mr. Annett sent a letter to the District of Columbia Office of Tax and Revenue stating that ACRC and ACRI apparently failed to apply for exemption from District of Columbia income and franchise tax.[9]

In July 2008 petitioner's attorney, Lewis P. Rhodes, requested that the California attorney general provide access to former Governor Pete Wilson's records of meetings with members of the board of regents during the summer of 1995 and "all documents reflecting communication between Ward Connerly and other members of the Regents." The attorney general's office informed petitioner that any such records had been transferred to the State archives and were not available for disclosure pursuant to State law.

In January 2009 petitioner filed an administrative complaint with the California Fair Political Practices Commission (CFPPC) alleging that Mr.

---

[9]The administrative record does not reflect whether the IRS or the District of Columbia Office of Tax and Revenue acted on the information contained in Mr. Annett's letters.

[*10] Connerly violated the California Political Reform Act of 1974 by failing to (1) register as a lobbyist in connection with his efforts to promote Proposition 209, (2) sign ACRC campaign statements in his capacity as "chairman", and (3) file a "statement of economic interests" with the board of regents before it voted on July 20, 1995, to amend UC's admissions policies. CFPPC informed petitioner that the alleged violations described in its complaint were "beyond the five-year statute of limitations for commencing an administrative action and there are no facts alleged or evidence presented that would allow for the tolling of the statute of limitations."

In June 2009 petitioner (acting through Mr. Huggins) filed a lawsuit in Federal District Court, assigned docket No. 2:09-CV-01503 FCD (EFB) against the California attorney general, CFPPC, IRS, DOE, and Connerly & Associates Inc. The complaint stated that petitioner was representing the interests of FFELP and alleged that the California attorney general was acting as a private attorney for Mr. Connerly and had improperly impeded petitioner's investigation into Mr. Connerly's, ACRC's, and ACRI's misconduct. On July 28, 2009, petitioner (with Mr. Huggins joining the suit as a plaintiff in his individual capacity) filed a first amended complaint identifying only IRS and DOE as defendants. Consequently, the remaining defendants were effectively dismissed from the action. The

[*11] amended complaint included a request that the court issue an order directing DOE "to remove the federal offset against Harold Huggins, and cease any and all loan collection activities". In March 2010 Rickie Ivie entered his appearance as counsel for petitioner and Mr. Huggins, and in May 2010 the parties to the suit entered into a stipulation (approved by the court) that, in the event the plaintiffs failed to file an amended complaint within 30 days, IRS and DOE would be dismissed from the suit with prejudice. The action ended when petitioner and Mr. Huggins failed to file a timely amended complaint.

III. Administrative Proceedings

A. Petitioner's Application for Exemption

On August 11, 2008, petitioner filed with respondent Form 1023, Application for Recognition of Exemption Under Section 501(c)(3) of the Internal Revenue Code. Petitioner's application includes a narrative description of its various administrative complaints and litigation activities described above. Petitioner did not attach any newsletters, brochures, or similar documents describing its charitable purpose as directed in part IV of Form 1023.

Petitioner's application included (1) a cover sheet and a table of contents for a proposal from EMS, Inc., to provide "Inbound Support Services" for petitioner, and (2) several certificates of registration issued by the U.S. Copyright Office in

[*12] respect of written works attributed to petitioner and identified as "Academic Senate Complaint", "Noncompliance Regents Complaint", and "A Resolution before the Regents of the University of California".

B. Respondent's First Request for Information

On March 9, 2009, respondent requested that petitioner provide additional information in support of its application including a detailed description of its activities and charitable purpose. Mr. Huggins responded to respondent's request by letter dated April 20, 2009, stating in relevant part:

> Response to Question Nos. 1, 2, 3 & 5: As the Director of the Council for Education ("Council"), my objective is to advocate for the legal rights of an unrepresented charitable class of federal student aid loan recipients. Investigate state administered financial student aid institutions, and to litigate for compensation the misappropriation of those federal loans used other than for educational purposes. (e.g. political activities).

In describing petitioner's charitable purpose, Mr. Huggins listed the various administrative complaints and the lawsuit it filed in Federal District Court, summarized above. He also mentioned that petitioner retained (1) the law firm of Patton & Boggs, LLP, to perform a forensic tax analysis of ACRC and ACRI, and (2) a witness with a Ph.D. in education to determine whether UC faculty members collaborated with Mr. Connerly in violation of the academic criteria standards of WASC.

**[\*13]**  Mr. Huggins further stated:

A.     The passage of California Proposition 209 in 1996, an initiative chaired by Regent Ward Connerly (i.e. California Civil Rights Initiative) amendments [sic] the California Constitution to include the phrase "preferential treatment," and thereby is in conflict with the federal U.S. constitution to the fourteenth Amendment.  The amended state constitution removed U.S. Citizen[s].  After passage of the proposition, the state increased the rate of Chinese and South Korean graduate[s] in the scientific fields of engineering from top tiered public schools in California and Michigan. And, thus, an increase in the number of Chinese graduates from U.S. Colleges & Universities is the objective of Chinese covert undercover operations in the United States facilitated by the activities of Ward Connerly, and his tax exempt organizations.

B.     Statistical data obtained from the U.S. State Department on the number of foreign student admissions of Chinese and South Korean student enrolment [sic] supports my thesis of a disproportional rate increase as compared to domestic rate admissions.

C.     Documents and analysis supporting my thesis is furthered [sic] described in an unpublished manuscript.

Among the attachments to Mr. Huggins' response was an engagement letter from Dorrance Publishing Co., Inc., addressed to Mr. Huggins and petitioner, regarding an agreement to publish Mr. Huggins' manuscript entitled "China Report: Undercover Operations in US Colleges and Universities."

**[*14]** Mr. Huggins indicated in his response that the only expenses petitioner incurred and expected to incur for 2008, 2009, and 2010 were professional fees (e.g., litigation expenses) of $98,567.08, $108,330.21, and $101,340.69, respectively. He also stated that petitioner held a "loan receivable" of $179,590.34 and included a "Line Of Credit Agreement" indicating that petitioner intended to borrow $395,000 from ISISCOM, LLC.[10]

C. Respondent's Second Request for Information

On May 29, 2009, respondent requested additional documents and information from petitioner including a current list of petitioner's officers and board members and a copy of petitioner's retainer agreement with Patton & Boggs, LLP, along with a detailed description of the work the law firm completed for petitioner. Mr. Huggins responded by letter dated June 8, 2009, repeating allegations that Mr. Connerly was guilty of misconduct in promoting Proposition 209 and informing respondent that petitioner recently filed a lawsuit in Federal District Court.

---

[10]The record indicates that petitioner and ISISCOM, LLC, share the same business address and that Mr. Huggins is the managing member of the latter.

**[\*15]**  D.  <u>Respondent's Third Request for Information</u>

By letter dated July 13, 2009, respondent requested that petitioner provide, inter alia, (1) an explanation whether Proposition 209 is the focus of petitioner's activities, (2) an explanation of the relationship between petitioner's exempt activities and Mr. Connerly, ACRI, and ACRC, (3) additional information about the "unrepresented charitable class" referred to in petitioner's amended articles of incorporation, (4) additional details regarding its plans to engage in litigation for "collateral restitution" including whether the law firms engaged in such litigation will receive a percentage of any monetary awards, and (5) a description of petitioner's plans to reimburse members of the charitable class and FFELP lenders under the National Lenders' Assurance Program.  Respondent again requested that petitioner provide a current list of its officers and board members.

Mr. Huggins responded by letter dated July 16, 2009, attaching some of the pleadings and other documents that he and petitioner filed in <u>Council for Educ. v. Cal. Att'y Gen.</u>, No. 2:09-CV-1503 (E.D. Cal. filed June 1, 2009), a copy of a letter from Patton & Boggs, LLP, indicating that the firm would no longer represent petitioner until its outstanding legal fees were paid in full, and a copy of a letter from the California Government Claims Program addressed to petitioner's attorney, Mr. Ivie, acknowledging receipt of petitioner's application for a

[*16] "Government Claim".[11]  Finally, Mr. Huggins referred respondent to a provision in petitioner's bylaws stating:  "The appointment of a Board of Directors shall commence ninety 90 days after the Corporation is fully funded and is able to pay each board member an annual salary to be determined through negotiations by the appointed Director."

E.  Respondent's Fourth Request for Information

By letter dated July 31, 2009, respondent requested additional information from petitioner including a detailed description of its plans to investigate and report instances of academic fraud related to federally guaranteed student loans. Respondent also requested copies of any brochures, pamphlets, newsletters, advertisements, or any other literature regarding petitioner.

On August 3, 2009, Mr. Huggins sent a series of facsimile transmissions to respondent and included a copy of the Form 1024, Application for Recognition of Exemption Under Section 501(a), and related documents, that ACRC submitted to the IRS in 1997.  By letter dated August 11, 2009, Mr. Huggins informed respondent that, in accordance with its mission statement, petitioner commissioned a report on the practical effects of Proposition 209, focusing on admission and

---

[11]The administrative record does not disclose the disposition of petitioner's "Government Claim".

[*17] graduation rates for African American students enrolled at UC. The letter was accompanied by (1) a report prepared by Dr. Dawn Person, dated June 26, 2008, discussing the impact of Proposition 209 on African American students and (2) a written exchange between Mr. Huggins and Ryan Azlein of Stubbs, Alderston & Markiles, LLP, regarding a proposed retainer agreement under which Mr. Azlein would assist with an otherwise unidentified private offering of securities.

F. Respondent's Fifth Request for Information

On August 12, 2009, respondent requested that petitioner provide the following information:

1. Please provide a detailed business plan for the next 2 years.

2. Please explain how you will gather public support for your advocacy programs.

3. How will the population you intend to serve be made aware of your services? Please explain and provide specific examples.

4. Please explain your relationship with Isecom LLC.

5. Please provide a complete copy of the report commissioned by you in 2008.

6. How many are represented in the class action?

**[*18]** 7.    Documents submitted August 3, 2009 indicate "the petitioner moves the court to order the U.S. Department of Education to remove the federal offset against Harold Huggins and cease any and all loan collections activities." Explain how this activity is exempt under Section 501(c)(3).

8.    The instruction of the public by recognized educational methods on controversial subjects may qualify for exempt status. On the other hand, the mere presentation of unsupported opinion is not "educational." (1.501(c)(3)- 1(d)(3) of the Income Tax Regulations). Using enclosed revenue ruling, explain your organization is educational within the meaning of 501(c)(3). (See enclosed Revenue Ruling 68-263).

9.    Provide detailed examples of student loan fraud that you will investigate.

In a letter to respondent dated September 14, 2009, Mr. Huggins stated that many of respondent's questions should be reviewed "in consensus with the Assistant United States Attorneys", citing questions 2, 3, 6 and 9, quoted above. Mr. Huggins also stated that petitioner would modify its Web site "to reflect that the Council for Education is a nonprofit, litigation, organization, contributions received will be used for professional attorney fees, research consultants, and professional staff in support thereof enforcing the audit provisions of the Higher Education Act by means of judicial opinion review."

**[*19]** On October 2, 2009, Mr. Huggins submitted a further response to respondent's letter dated August 3, 2009, as follows:

1. Response to Question No. 1: CforEd is in the process of retaining an outside consultant to write a Business Plan;

2. Response to Question No. 2: CforEd will gather public support through the filings of legal pleadings in federal courts designed to enforce the academic criteria standards mandated by Congress under the provisions of the Higher Education Act which is enforced by those academic institutions;

3. Response to Question No. 3: The public will benefit through greater transparency of those academic institutions. According to a U.S. Department of Education study, 41 percent of low-income students entering a post secondary college managed to graduate within five years as compared [to] 66 percent of high-income students. CforEd is an advocate for universally recognized blind academic evaluations through the use of electronic machines, rather than individual grader;

4. Response to Question No. 4: IsisCom, LLC., is CforEd's underwriter. I presently serve as ISISCOM, LLC., manager,

5. Response to Question No. 5: Read herein enclosed attachment Exhibit "A";

6. Response to Question No. 6: The commissioned researched and federal court system will determine the likely class action status;

**[*20]** 7.     Response to Question No. 7:  The goal of the legal proceedings in Council v U S Department of Education, et al., is to provide temporary debt relief until the final disposition of an administrative review process;

8.     Response to Question No. 8:  Unsupported opinions are those court pleadings (i.e. Revenue Ruling 68-263, 1968-1 CB 256) filed before a judicial judge for review, thus, the unsupported opinion becomes a supported judicial opinion upon review thereafter by the federal judge; and

9.     Response to Question No. 9:  An example of student loan fraud is the awarding of student grades on the bases of social economics rather than academic standards as recognized by those academic accreditation institutions (i.e. Western Association of Schools and Colleges, and Council for Higher Education Accreditation).

a. Ethic violations of collusion regarding a conflict of interest between a student and faculty member, where said faculty member has a financial, quid quo pro, economic benefit (i.e. failure to remove one self from the decision process  constitutes a violation);

b. A violation of a student's legal right to an academic appeal regarding an instructor's evaluation therefore constitutes a violation.

IV.  <u>Respondent's Preliminary Determination and the Appeals Process</u>

On May 25, 2010, respondent issued a preliminary determination concluding that petitioner (1) was not organized or operated exclusively for an exempt purpose within the meaning of section 501(c)(3), and (2) was operated

[*21] primarily to serve Mr. Huggins' private interests. Petitioner appealed respondent's preliminary determination, asserting that it was engaged in education activities that served an exempt purpose within the meaning of section 501(c)(3).

During the appeal process, Mr. Huggins sent a letter to the Appeals Office stating that petitioner provides educational materials to college applicants informing them of colleges and universities with high student attrition rates, with the aim of reducing the risk of default on Federal student loans, and that petitioner advocates on behalf of Federal student loan recipients through litigation intended to protect individual civil rights. Mr. Huggins did not produce any educational materials such as pamphlets or newsletters. The Appeals Office concluded that petitioner was not operated for an exempt purpose.

V. Respondent's Final Determination

As indicated, respondent issued to petitioner a final notice of determination denying its application for exemption under section 501(c)(3). The notice states that petitioner failed to show that (1) its activities are educational within the meaning of section 1.501(c)(3)-1(d)(3)(1), Income Tax Regs., and (2) it is operated exclusively for an exempt purpose.

**[*22]**                                    Discussion

Section 501(a) provides in relevant part that an organization described in section 501(c)(3) (including a corporation) shall be exempt from Federal income tax unless exemption is denied under section 502 or 503.  To qualify as an exempt organization described in section 501(c)(3), a corporation generally must demonstrate that (1) it is organized and will operate exclusively for religious, charitable, scientific, educational, or other specified exempt purposes; (2) no part of its net earnings will inure to the benefit of a private shareholder or individual; (3) no part of its activities constitutes intervention or participation in any political campaign on behalf of any candidate for public office; and (4) no substantial part of its activities consists of political or lobbying activities.  Am. Campaign Acad. v. Commissioner, 92 T.C. 1053, 1062 (1989).

Qualification as a corporation described in section 501(c)(3) not only provides an exemption from Federal income tax, but also generally permits the corporation to solicit and accept donations which normally are deductible by the donor against his or her Federal income tax.  See sec. 170(c); Bob Jones Univ. v. United States, 461 U.S. 574, 578 (1983).

Section 1.501(c)(3)-1(b)(1)(i), Income Tax Regs., provides that an organization is "organized exclusively" for one or more exempt purposes only if

**[\*23]** its articles of organization (1) limit the purposes of such organization to one or more exempt purposes and (2) do not expressly empower the organization to engage, otherwise than as an insubstantial part of its activities, in activities which in themselves are not in furtherance of one or more exempt purposes.

Respondent's notice of determination does not refer to whether petitioner is organized exclusively for an exempt purpose, and the matter is not addressed in respondent's answer to the petition as amended. Under the circumstances, respondent is deemed to have conceded that petitioner was organized exclusively for an exempt purpose.

An organization will be regarded as "operated exclusively" for one or more exempt purposes only if it engages primarily in activities which accomplish one or more of the exempt purposes specified in section 501(c)(3) (i.e., religious, charitable, scientific, testing for public safety, literary, or educational purposes). Sec. 1.501(c)(3)-1(c)(1), Income Tax Regs. An organization will not be so regarded if more than an insubstantial part of its activities is not in furtherance of an exempt purpose, see id., or if the organization operates for the benefit of private interests such as designated individuals or the creator of the organization, see sec. 1.501(c)(3)-1(d)(1)(ii), Income Tax Regs.

[*24] Respondent asserts that petitioner failed to show that it is operated exclusively in furtherance of a charitable or educational purpose and that, in fact, its activities serve Mr. Huggins' private interests. Petitioner maintains that its litigation activities accomplish a charitable purpose--promoting social welfare--by defending human and civil rights secured by law.

The term "charitable" in section 501(c)(3) is used in its generally accepted legal sense and includes activities such as relief of the poor or the underprivileged; advancement of religion, education, or science; lessening the burdens of Government; and promotion of social welfare, including eliminating prejudice and discrimination and defending human and civil rights. Sec. 1.501(c)(3)-1(d)(2), Income Tax Regs. The fact that an organization, in carrying out its primary purpose, advocates social or civic changes or presents opinion on controversial issues does not preclude the organization from qualifying under section 501(c)(3) so long as it is not an action organization of any one of the types described in paragraph (c)(3) of section 1.501(c)(3)-1, Income Tax Regs. Id.[12]

The Commissioner recognizes that some organizations that provide legal services or engage in litigation may serve a charitable purpose within the meaning

---

[12]Respondent does not contend that petitioner is an action organization (i.e., an organization that attempts to influence legislation or participates in a political campaign) within the meaning of sec. 1.501(c)(3)-1(c)(3), Income Tax Regs.

**[*25]** of section 501(c)(3). A review of IRS administrative rulings shows that the Commissioner has granted tax-exempt status to legal services organizations including: (1) legal aid societies that provide free or subsidized legal services to indigent or low-income persons, see Rev. Rul. 69-161, 1969-1 C.B. 149; (2) organizations that assist individuals or groups in litigation to protect human and civil rights, see Rev. Rul. 73-285, 1973-2 C.B. 174 (discussing the exempt status of an organization that provided funds to defend members of a religious sect in legal actions involving substantial constitutional issues);[13] (3) so-called public interest law firms--organizations that employ in-house attorneys to provide legal representation to individuals or groups in respect of matters of broad public interest, see Rev. Proc. 92-59, 1992-2 C.B. 411 (providing general guidelines for public interest law firms); and (4) organizations that act as the party-plaintiff in administrative and judicial proceedings to enforce Federal and State laws for the benefit of the general public, see Rev. Rul. 80-278, 1980-2 C.B. 175 (discussing the exempt status of an organization that filed suit against a local manufacturer and the State environmental protection agency for the purpose of enjoining the

---

[13]To the same effect, see Rev. Rul. 68-438, 1968-2 C.B. 209, discussing the exempt status of an organization that worked with trade associations for the purpose of encouraging compliance with civil rights laws.

**[\*26]** manufacturer from continuing to emit certain air contaminants and to require the State agency to enforce applicable laws).

Petitioner contends that it will act as an advocate for Federal student loan recipients and for FFELP lenders, investigate State-administered student loan programs for improprieties, seek restitution through litigation, commission a public report on institutional misconduct, and reimburse "members of the charitable class". Although these objectives are matters that would engender a broad public interest, we cannot say on the basis of this record that petitioner has been or will be operated in a manner that will further a charitable purpose.

Mr. Huggins undoubtedly believes he was mistreated by faculty and other officials at UCSB and that his inability to complete his studies at UCSB is attributable in large part to Mr. Connerly and his efforts in support of Proposition 209. Seeking redress, Mr. Huggins embarked on what is best described as a quixotic quest for relief, filing numerous lawsuits, without the assistance of an attorney. As previously discussed, those lawsuits were dismissed primarily as a result of his failure to state a claim. Many of his filings were frivolous or groundless, leading the Federal District Court to declare him a vexatious litigant.

Undeterred, Mr. Huggins organized petitioner and filed another lawsuit, similar in many respects to those that preceded it, targeting not only Mr. Connerly,

**[\*27]** but also the California attorney general, CFPPC, IRS, and DOE. Much like Mr. Huggins' earlier lawsuits, this action was dismissed when petitioner failed to file a proper amended complaint within the time prescribed in a stipulation approved by the court.

This Court has previously held that, where an individual creates and controls the affairs of an organization seeking tax-exempt status, there is an obvious opportunity for abuse, which necessitates an open and candid disclosure of all facts bearing upon the organization and its operations and finances so that the Court can be assured that by granting the claimed exemption it is not sanctioning an abuse of the revenue laws. Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C. 531, 535 (1980), aff'd, 670 F.2d 104 (9th Cir. 1981); see Levy Family Tribe Found., Inc. v. Commissioner, 69 T.C. 615, 618-619 (1978). Where such disclosure is not made, the logical inference is that the facts, if disclosed, would show that the taxpayer fails to meet the requirements of section 501(c)(3). Bubbling Well Church of Universal Love, Inc. v. Commissioner, 74 T.C. at 535. As discussed below, many of petitioner's responses to respondent's requests for information were less than open and candid, particularly responses relating to its operations and finances, leading the Court to conclude that the

**[*28]** undisclosed facts would show that petitioner fails to satisfy the requirements of section 501(c)(3).

Petitioner has not adopted an operating structure or procedures necessary to ensure that its activities are properly focused to further its alleged charitable purpose. Prominent among petitioner's shortcomings are the lack of a formal business plan and an independent board of directors to provide operational guidance and oversight.[14] See P.L.L. Scholarship Fund v. Commissioner, 82 T.C. 196, 200 (1984) (discussing the importance of an independent board of directors). Mr. Huggins is not an attorney, and he appears to lack any formal training or experience in either the practice of law, business administration, or the operation of a charitable organization; yet he is acting as petitioner's sole officer, director, and employee. To be blunt, we are not persuaded that Mr. Huggins has demonstrated the legal skills or business acumen needed to conduct petitioner's operations to achieve its charitable purpose or to further the public good.

---

[14]Mr. Huggins informed respondent that petitioner would not appoint a board of directors until it has the funds to pay the board members for their services. There is no indication whether Mr. Huggins considered the possibility of populating the board of directors with individuals willing to volunteer their services. Moreover, although petitioner informed respondent that its litigation activities were directed by Special Committee 1868, the administrative record does not include any information regarding the composition of its membership, their individual qualifications, or the group's activities.

**[\*29]** The administrative record likewise is devoid of any evidence that petitioner has adopted any formal policies governing its day-to-day operations including such critical matters as proper financial and accounting controls, the amount of Mr. Huggins' compensation, acceptable compensation arrangements with outside attorneys, and oversight of litigation practices and strategies. In the light of these substantial deficiencies, we cannot say that petitioner will be operated in furtherance of a charitable purpose within the meaning of section 501(c)(3).

We also would be hard pressed to say that petitioner's operations do not more than incidentally further Mr. Huggins' private interests. We note that the lawsuit that petitioner and Mr. Huggins jointly filed against IRS and DOE not only was substantially similar to the earlier lawsuits that Mr. Huggins filed in his individual capacity, but also included a request for a court order directing DOE to terminate its efforts to collect Mr. Huggins' personal student loan debt. See generally Nationalist Movement v. Commissioner, 102 T.C. 558, 574-575 (1994), aff'd, 37 F.3d 216 (5th Cir. 1994).[15]

_____

[15]Insofar as petitioner contends that it will operate to serve an educational purpose, we note that petitioner failed to provide respondent with any pamphlets, flyers, or other written material representative of its educational activities. In addition to the shortcoming discussed above, in the absence of such material we are unable to evaluate petitioner's claim that its educational activities achieve an exempt purpose within the meaning of sec. 501(c)(3).

**[*30]** To reflect the foregoing,

<u>Decision will be entered</u>

<u>for respondent</u>.
